# Illinois Official Reports

## Appellate Court

---

**People v. Wilkerson, 2016 IL App (1st) 151913**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TORRAY WILKERSON, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-1913 |
| Filed | August 26, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-09402; the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Mitchell D. Kreiter and Abbey Rosen, both of Kreiter & Rosen & Associates, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, and Sara McGann, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Presiding Justice Reyes and Justice Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a bench trial, defendant was convicted of being an armed habitual criminal, possession with the intent to deliver 900 grams or more of heroin, and unlawful use of a weapon by a felon, but found not guilty of armed violence. Defendant was sentenced on June 24, 2015, to the minimum sentence of 15 years for possession of a controlled substance with intent to deliver and 7 years for being an armed habitual criminal with the unlawful use of a weapon count to merge into that count. The court ordered both sentences to run concurrently.

¶ 2        On this appeal, defendant claims (1) that he was denied effective assistance of trial counsel where trial counsel (a) had a conflict of interest, (b) stipulated to the laboratory analysis, (c) failed to cross-examine a police officer about his vantage point in viewing defendant throw a gun out a window, and (d) failed to inquire about defendant's employment history; (2) that the State failed to establish guilt beyond a reasonable doubt that defendant possessed 900.5 grams of drugs with the intent to deliver; (3) that the conviction must be reversed due to inconsistent findings between defendant and codefendant where the State presented more evidence of guilt against codefendant, who was found not guilty, than against defendant, who was found guilty; and (4) that defendant's convictions for armed habitual criminal and unlawful use of a weapon by a felon should be reversed because the police officer's testimony concerning his view of the gun disposal was incredible. For the following reasons, we affirm defendant's convictions and sentence.

¶ 3                                          BACKGROUND

¶ 4        Defendant Torray Wilkerson was indicted on six felony counts including armed violence, armed habitual criminal, a Class X possession of a controlled substance with the intent to deliver, two counts of unlawful use of a weapon by a felon, and aggravated unlawful use of a weapon. The State dismissed one of the unlawful use of a weapon by a felon counts, as well as the aggravated unlawful use of a weapon count, before trial.

¶ 5        The evidence at trial established that on May 1, 2014, a nine-man team of police officers executed a search warrant of a three-story building on West Ogden Avenue in Chicago, which consisted of five apartments and a storefront. The target of the search warrant was an individual named Todd Jones. The team did not find Todd Jones at the location but instead found defendant and codefendant as well as drugs that were recovered in the storefront. At trial, the State called police officers Kyle Mingari, Bill Murphy, and Mark Gutkowski. Defendant did not testify. The parties stipulated to the findings of forensic chemist Lenetta Watson. After trial, the trial court held a posttrial evidentiary hearing regarding defendant's claim of ineffective assistance of trial counsel.

¶ 6                                   I. Evidence at Trial
¶ 7                        A. Direct Examination of Officer Kyle Mingari
¶ 8        On October 22, 2014, Officer Kyle Mingari testified that he is a police officer assigned to the bureau of organized crime, narcotics division. He has been a Chicago police officer for eight years; he had been assigned to his unit for 2½ years; and he had executed search warrants in the past and had received training for firearms, both with the Chicago police department (CPD) and the Marine Corps.

¶ 9        Officer Mingari testified that on May 1, 2014, at 12:51 p.m., he, along with his supervisor and seven other police officers, executed a search warrant at an apartment building located on West Ogden Avenue in Chicago. The three-story building contained three apartments in the rear and an empty storefront with two apartments above it. The search warrant was confined to the first-floor rear apartment.

¶ 10       Officer Mingari testified that, while standing in a hallway between the front door of the rear apartment and the rear door to the storefront, he heard the sounds of a television coming from the storefront and knocked on the door. A male voice responded asking who it was, and Officer Mingari announced that he was a Chicago police officer, at which time he heard a second male voice respond "hold on." Officer Mingari then heard a distinct sound that he believed to be a gun slide being racked[1] and simultaneously heard "a front door opening to the front." At that time Officer Mingari heard one of his team members, Officer McKenna, yell from his position in the gangway on the east side of the building that codefendant Senica Wilkerson was climbing over the gate and running out from the front. At that point Officer Mingari moved toward the front of the building and observed another team member, Officer Mark Gutkowski, pursuing codefendant Senica Wilkerson. Officer Mingari made an in-court identification of codefendant as the individual he observed Officer Gutkowski pursuing.

¶ 11       Officer Mingari testified that, after he observed Officer Gutkowski pursuing codefendant, he exited the building out of the side stairwell and was standing in front of the building where he observed, through the scissor gates, that the front glass door was open. Officer Mingari could see through the open glass door into the storefront, and he observed defendant exiting out of the back door and up the stairwell to the second floor. Officer Mingari made an in-court identification of defendant, who he observed running up the stairs. He pursued defendant through the gangway and into the center hallway. At that time, he heard a door slam on the second floor, but he waited for assistance until team member, Officer Matthews,[2] arrived.

¶ 12       Officer Mingari testified that, after Officer Matthews arrived, Officer Mingari knocked on the door to the second-floor rear apartment, and there was no response. Officer Mingari then heard his supervisor, Sergeant Steck, relaying over the radio that Officer Bill Murphy, who was outside, had observed an individual inside that apartment open a window and discard what he believed was a firearm onto an adjacent roof. During this time, Officer Mingari remained at the door until defendant opened it and allowed officers Mingari and Matthews to enter. The officers temporarily detained defendant and Officer Murphy positively identified defendant as the individual he had observed discard the firearm onto the roof.

¶ 13       Officer Mingari testified that he went back down to the first floor and observed the empty storefront from his position at the threshold of the open rear door. Officer Mingari observed what he perceived to be several packages of drugs and two dogs in a cage. Officer Mingari could observe the storefront through the open door without opening it any further. After waiting for additional officers, he conducted a security sweep of that storefront. During the

---

[1]A "slide being racked" refers to the procedure of pulling the slide of a handgun back in order to eject an empty cartridge case from the chamber. Tom McHale, *How To Rack Your Handgun Slide Like A Boss*, Beretta Blog (Apr. 3, 2014, 9:58 a.m.), http://blog.beretta.com/how-to-rack-your-handgun-slide-like-a-boss.

[2]Neither Officer Matthews' nor Sergeant Steck's first names are available in the record, as neither testified in open court.

search, Officer Mingari observed packages of heroin, 85 total, on the table and a large quantity of heroin in the bathroom on a mirror that was on a toilet. He also observed a large case containing the prescription drug Dormin, which Officer Mingari testified is a sleeping aid usually used as a cutting substance in the mixing of drugs, as well as several more packages of drugs. After conducting a more thorough search, he observed a clear white trash bag with ammunition in it, as well as a large clear knotted bag that contained heroin. Officer Mingari also recovered four digital scales, three mixers, and a sifter.

¶ 14 Officer Mingari identified the following photographs that were admitted into evidence: (1) a photograph of the storefront entrance with scissor gates and an open glass door; (2) a photograph of the rear of the storefront, depicting the table with the drugs, on which Officer Mingari circled the drugs recovered from the table and the location of the digital scale and the sifter; (3) a photograph of the table where 85 bags of drugs were found; (4) a photograph of a blue plastic bin that contains mixers; (5) a photograph of the bundled packages of drugs on the floor toward the front of the storefront; (6) a photograph of the front portion of the storefront; (7) a photograph of a clear plastic bag of drugs; and (8) a photograph of the toilet covered by a mirror covered in heroin in the bathroom of the storefront. Officer Mingari testified that the eighth photograph entered into evidence depicted "the mirror with the pile of heroin on top of the mirror which is on the toilet" in the bathroom of the storefront.

¶ 15 Officer Mingari testified that he placed all the evidence into a blue plastic Rubbermaid bin and gave it to Officer Gutkowski. Officer Mingari then went back to the Homan Square police headquarters and spoke with defendant and codefendant, who are brothers. The codefendant told him that, at the time the search warrant was executed, only he and defendant were in the storefront and that defendant's residence was the second-floor rear apartment, which was the same apartment where defendant answered the door for Officer Mingari and from which Officer Murphy observed defendant throw the gun onto the roof. The codefendant told him that he resided on West Congress Avenue in Chicago.

¶ 16 **B. Cross-Examination of Officer Kyle Mingari**

¶ 17 On cross-examination, Officer Mingari identified the search warrant, which he and his team executed at West Ogden Avenue on May 1, 2014. In the portion of the search warrant that indicated the premises to be searched, Officer Mingari testified that it indicated only the first floor. Officer Mingari testified that the individual that was the subject of the search warrant, Todd Jones, was a 6-foot-2-inch, 200-pound, 58-year-old African American and that codefendant did not resemble a 58-year-old man but that the officers still gave chase. Officer Mingari testified that codefendant had to climb over the scissor gates and that the glass door is visible in People's exhibit No. 1, but it was covered in plastic bags and he could not see through the glass. Officer Mingari testified that, in the photograph, the door was being propped open to air out the storefront, but that when he observed the storefront through the door, the door was open without being propped open. Defense counsel asked if the door automatically closed if it was not propped open, and Officer Mingari testified that it did not but that it was propped open at the time of the taking of the photograph in order to ensure that it stayed open.

¶ 18 **C. Redirect**

¶ 19 Officer Mingari clarified on redirect that the door was open at the time the photograph was taken in order to air out the inside of the storefront due to heroin residue or powder. Officer

Mingari testified that when officers are exposed to chemicals or drugs they are required to do an exposure report.

¶ 20                                D. Officer Bill Murphy

¶ 21        Officer Bill Murphy testified that he has been a Chicago police officer for 18 years and had been assigned to the narcotics unit for over eight years. Prior to working for the CPD, Officer Murphy testified that he worked for two years as a reserve officer for the City of Wheaton and spent four years as a military policeman in the Army. Officer Murphy testified that he conducted previous drug investigations and executed search warrants and is familiar with the appearance of firearms. On May 1, 2014, at 12:51 p.m., he was a part of the team that was executing a search warrant. After the team finished executing the search warrant, he stayed on the outside perimeter of the building conducting security. Officer Murphy heard one of his teammates, Officer McKenna, yell out from the front area of the building that someone was running, and Officer Gutkowski began running to the front while Officer Murphy stayed near his location. Officer Murphy then heard a door slam; the sound had come from his right and above him, toward the back of the building. Within 30 seconds, he heard a screen opening from above and observed an individual lean out of the window and toss what he believed to be a handgun on the roof of an adjacent building that was approximately six feet above the window he observed defendant leaning from. Officer Murphy made an in-court identification of defendant as the individual he observed throw the gun. After he made these observations, he yelled to his supervisor, who was in the rear of the building, that he observed someone throw a gun on the roof. His supervisor notified the other team members via radio, and Officer Murphy stayed in his location to maintain surveillance.

¶ 22        Officer Murphy testified that, within five minutes, another team member, Officer Scharr, relieved him, and he went inside the residence to identify the person officers Mingari and Matthews had detained, whom he identified as defendant. Officer Murphy then returned to his previous location to stand with Officer Scharr and wait for the Chicago fire department to arrive to retrieve the firearm from the roof. Officer Murphy and a firefighter entered the basket of a cherry picker and were brought up to the roof, where Officer Murphy recovered the gun, unloaded it, and emptied the magazine. The gun was a Glock Model 19 9-millimeter pistol, which was loaded with 1 round in the gun and 12 in the magazine. Officer Murphy then identified People's exhibit No. 10 as a photograph depicting an overhead view of the two buildings on West Ogden Avenue. Officer Murphy placed an "X" where he was standing when he observed defendant throw the gun onto the roof. Officer Murphy placed a "G" on the location where he recovered the handgun. Officer Murphy identified People's exhibit No. 11 as a photograph depicting an overhead view of where he had been standing. After he recovered the handgun, he gave it to Officer Gutkowski.

¶ 23        On cross-examination Officer Murphy testified that, when he observed defendant lean out the window, Officer Murphy was approximately 15 to 20 feet from him and he could observe defendant's body from the chest up.

¶ 24                          E. Officer Mark Gutkowski's Testimony

¶ 25        Officer Mark Gutkowski testified that he is assigned to the narcotics section of the CPD and that he has been a police officer for 11 years and in the narcotics unit for six years. On May 1, 2014, Officer Gutkowski was part of a team executing a search warrant on the rear

apartment of the building on West Ogden Avenue. After the team finished executing the warrant, he observed several members of the team approach the rear entrance door of the storefront, and he went outside behind the building. Once he relocated, he heard Officer McKenna yelling, "He's coming out the front. He's running." Officer Gutkowski then ran to Ogden Avenue through the vacant lot on the west side of the building and observed a black male being pursued by Officer McKenna across Ogden Avenue. Officer Gutkowski pursued on foot, running across Ogden Avenue and eventually detaining the individual. Officer Gutkowski identified that individual as codefendant. Officer Gutkowski held codefendant on the ground until Officer Scharr arrived, at which point the officers placed codefendant in handcuffs and asked him if he had anything on his person. Codefendant had $3560 in United States currency in his right pants pocket.

¶ 26      All evidence recovered was then placed into a blue Rubbermaid bin, which Officer Gutkowski carried out and placed inside an enforcement vehicle. Officer Gutkowski testified that Officer Murphy gave him the handgun that was recovered from the roof, which was also placed in the bin. The officers then returned to Homan Square, where they separated and bagged all the recovered evidence and performed an inventory. Officer Gutkowski testified that he heat-sealed the bags with the drugs, and they were logged on an inventory log sheet and dropped into a safe at the front desk, and that the handgun was sealed into a manila envelope and placed into a locker located at the front desk.

¶ 27                              II. Forensic Chemist Stipulation

¶ 28      The parties then stipulated that, if Lenetta Watson, a forensic chemist at the Illinois State Police crime lab, was called to testify, she would testify that she received Inventory No. 13162564, which was opened and found to contain a powdery substance that tested positive for the presence of heroin and weighed 774.3 grams; that she received Inventory No. 13162571, which she opened and found to contain a powdery substance that tested positive for the presence of heroin and weighed 89.3 grams; and that she received Inventory No. 13162566, which was opened and found to contain 85 items of a powdery substance and which tested positive for the presence of heroin and that weighed 36.9 grams in total. The parties stipulated that Watson would further testify that the total actual weight of all three inventories was 900.5 grams of heroin.

¶ 29      The parties further stipulated that Watson would testify that she is employed by the Illinois State Police crime lab and is qualified to testify as an expert in the area of forensic chemistry; that all the equipment used was tested, calibrated, and functioning properly when those items were tested; and that she performed tests commonly accepted in the area of forensic chemistry for ascertaining the presence of a controlled substance on all of the inventories. The stipulation was moved into evidence. Defense counsel then made a motion to quash the arrest and suppress the evidence, which the trial court denied.

¶ 30                                      III. Verdict

¶ 31      The trial court found codefendant not guilty of possession with intent to deliver—the only offense with which he was charged—stating that:

          "[C]ertainly he did flee from the apartment. But even an innocent person seeing
          that much narcotics would run. So his testimony was that he didn't live there. That was
          admitted. And, again, mere presence—even negative—negative—mere presence right

there—I find that that's a very high burden of proof beyond a reasonable doubt. There is not enough proof there to hold him responsible at that time, so I am finding him not guilty of Count 3, which is possession with intent, more than 900 grams of heroin. So there will be a not guilty there."

¶ 32 The trial court found defendant not guilty of count I, armed violence; guilty of count II, armed habitual criminal; and guilty of count IV, unlawful use of a weapon by a felon.

¶ 33 The trial court then found defendant guilty of count III, possession of more than 900 grams of heroin with intent to deliver, stating that:

"[Th]ere is packaging paraphernalia. The Dormin was there, which is a cut. There is scales. There is many other things. And the amount of—the weight also goes to possession with intent. I find that the State has proved each and every element of Count 3 beyond a reasonable doubt of possession of heroin with intent to deliver more than 900 grams."

¶ 34 Defendant was found guilty of possession of 900.5 grams of heroin with intent to deliver. 900 grams is the threshold weight that results in a 15-year minimum sentence. 720 ILCS 570/401(a)(1)(D) (West 2012). Defendant was sentenced to 15 years with the Illinois Department of Corrections (IDOC) for possession of more than 900 grams of heroin with intent to deliver and sentenced to 7 years for being an armed habitual criminal. The trial court merged the armed habitual criminal count with the count of unlawful use of a weapon by a felon and ordered the possession and armed habitual criminal sentences to run concurrently. Defendant's trial counsel then made an oral motion to reconsider defendant's sentence, which the trial court denied.

¶ 35                     IV. Posttrial Motions and Evidentiary Hearing

¶ 36 After his trial, defendant was appointed new posttrial counsel. On March 23, 2015, defendant's posttrial counsel filed a posttrial motion for a new trial and for reconsideration of the findings of guilt. In his motion, defendant claimed (1) that mere presence in a place from which narcotics are recovered is not sufficient to establish possession beyond a reasonable doubt; (2) that the search warrant, which the officers were executing on May 1, 2014, was flawed; and (3) that he received ineffective assistance of trial counsel.

¶ 37 On June 18, 2015, the parties held an evidentiary hearing on defendant's ineffectiveness of counsel claim. Defendant's trial counsel testified at the hearing that he had been an attorney since 1995 and a defense attorney since 2003. Counsel testified that he filed an appearance at a bond hearing for codefendant and met with codefendant before the hearing, that codefendant paid him on behalf of defendant, that defendant was well aware that codefendant was paying counsel for representing defendant, and that counsel and defendant had discussed it. Counsel testified that he visited defendant one time in Cook County jail and that the rest of their conversations occurred in the lockup. Defendant's posttrial counsel asked why he did not utilize a defense arguing that codefendant was the person in possession of the drugs, and defendant's trial counsel responded that he thought defendant and codefendant had very similar defenses and that he and defendant both agreed on a defense strategy to question Officer Mingari's vantage point because the officer could not have observed what he said he had observed.

¶ 38    After listening to both parties' arguments, the trial court found that, looking at the totality of the facts, there was no conflict of interest. The trial court also found that there was no evidence to support defendant's claim of ineffective assistance of counsel. The trial court denied defendant's posttrial motion for a new trial and his supplemental motion for a new trial, as well as his motion to reconsider the finding of guilt. Defendant filed a notice of appeal on July 14, 2015, and this appeal followed.

¶ 39                                        ANALYSIS

¶ 40    On this appeal, defendant claims (1) that he was denied effective assistance of trial counsel where trial counsel (a) had a conflict of interest, (b) stipulated to the laboratory analysis, (c) failed to cross-examine a police officer about his vantage point in viewing defendant throw a gun out a window, and (d) failed to inquire about defendant's employment history; (2) that the State failed to establish guilt beyond a reasonable doubt that defendant possessed 900.5 grams of drugs with the intent to deliver; (3) that the conviction must be reversed due to inconsistent findings between defendant and codefendant where the State presented more evidence of guilt against codefendant, who was found not guilty, than against defendant, who was found guilty; and (4) that defendant's convictions for armed habitual criminal and unlawful use of a weapon by a felon should be reversed because the police officer's testimony concerning his view of the gun disposal was incredible. For the following reasons, we affirm defendant's convictions for possession of a controlled substance with intent to deliver, being an armed habitual criminal, and unlawful use of a weapon by a felon.

¶ 41                         I. Ineffective Assistance of Counsel

¶ 42    First, defendant claims that he received ineffective assistance of counsel where his attorney had a conflict of interest that adversely affected his performance. Defendant argues that his trial counsel was ineffective by stipulating to the laboratory analysis where the State would not have been able to prove the weight of the narcotics, by failing to cross-examine an officer about his vantage point, and by failing to ask defendant about his employment status, which could have been beneficial in sentencing. We find that there was no conflict of interest that existed that adversely affected the performance of defendant's trial counsel.

¶ 43                              A. Standard of Review

¶ 44    The Illinois Supreme Court has held that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504, 525 (1984) (adopting *Strickland*)). Under *Strickland*, a defendant must prove both (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant. *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004); *Strickland*, 466 U.S. at 687.

¶ 45    Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *Colon*, 225 Ill. 2d at 135. Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to

undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135.

¶ 46    To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "That is, if an ineffective assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). A reviewing court will not second-guess a counsel's trial strategy simply because defendant was convicted. *People v. Johnson*, 385 Ill. App. 3d 585, 602 (2008). Moreover, the court gives a great amount of deference to counsel's judgment and indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

¶ 47    Further, Illinois recognizes two categories of conflict of interest: *per se* and actual conflict. *People v. Austin M.*, 2012 IL 111194, ¶ 80. *Per se* conflict of interest arises when certain facts about a defense attorney's status create a disabling conflict, which is grounds for automatic reversal regardless of whether the conflict actually impacted the attorney's performance. *People v. Taylor*, 237 Ill. 2d 356, 374 (2010). Actual conflicts of interest generally involve joint or multiple representation of codefendants. *Taylor*, 237 Ill. 2d at 375. To prove an actual conflict, the accused need not prove prejudice in that the conflict contributed to the conviction, but it is necessary to establish that an actual conflict of interest adversely affected the lawyer's performance. *Taylor*, 237 Ill. 2d at 375. " 'What this means is that the defendant must point to some specific defect in his counsel's strategy tactics, or decision making attributable to the conflict.' " *Taylor*, 237 Ill. 2d at 376 (quoting *People v. Spreitzer*, 123 Ill. 2d 1, 18 (1988)).

¶ 48                                    B. Actual Conflict of Interest

¶ 49    In the case at bar, defendant's trial counsel previously represented codefendant, who was found not guilty, at a bond hearing. Any potential conflict of interest arising from joint representation was then cured when trial counsel stopped representing codefendant after the bond hearing and only represented defendant from then on. However, defendant was aware that codefendant was paying for defendant's representation, but it did not have an adverse impact on trial counsel's performance.

¶ 50    It was not unreasonable for defendant's trial counsel to argue that defendant was merely present instead of asserting that codefendant was responsible for the narcotics because it was sound trial strategy to rely on discrediting the police officer's testimony about his vantage point. In the evidentiary hearing about defendant's ineffective assistance of counsel claim, trial counsel testified he and defendant discussed this strategy and both agreed to pursue this defense. Therefore, there is not a conflict of interest that affected trial counsel's performance.

¶ 51                            C. Stipulation to Findings of the Forensic Chemist

¶ 52    Second, defendant argues that it was improper for his trial counsel to stipulate to the findings of the forensic chemist, particularly the weight of the narcotics recovered. Defendant argues that, based on People's exhibit No. 8, trial counsel knew or should have known that the powder from the bathroom was commingled prior to testing. Therefore, when defendant's trial counsel stipulated to the weight of the narcotics, he relieved the State from proving that the defendant possessed 900 grams or more of a substance containing heroin, which the State would not have been able to prove. Further, defendant argues that the forensic chemist should

have been cross-examined about the calibration of the scales because the net weight of the narcotics was only 0.5 gram over the required amount.

¶ 53 "When a defendant is charged with possession of a specific amount of an illegal drug with intent to deliver and there is a lesser included offense of possession of a smaller amount, then the weight of the seized drug is an essential element of the crime and must be proved beyond a reasonable doubt." *People v. Jones*, 174 Ill. 2d 427, 428-29 (1996). When the seized samples are homogenous, random testing is permissible and it can be inferred beyond a reasonable doubt that the untested samples contain the same substance as those that are tested. *Jones*, 174 Ill. 2d at 429. However, where the seized samples are not sufficiently homogenous, a portion from each distinct sample must be tested so that the contents can be conclusively determined. *Jones*, 174 Ill. 2d at 429. This is especially true given that Dormin, a cutting agent that looks similar to heroin, was recovered in the storefront.

¶ 54 Defendant argues that the photograph identified as People's exhibit No. 8 depicts three distinct piles: one on the left, one on the right, and one inside the sifter. Defendant argues that those piles were commingled prior to testing when Officer Mingari collected them in a Rubbermaid bin and the substance was inventoried under one number. However, this court examined People's exhibit No. 8, and the photograph does not depict three distinct piles on the mirror, but one mass of powder. There is a pile of powder in the sifter resting on top of the mass, but a sifter contains holes and would not prevent the substances from commingling. Further, neither the assistant State's Attorney nor defense counsel asked Officer Mingari whether he commingled any powder. Officer Mingari testified only that People's exhibit No. 8 was a photograph of "the mirror with the pile of heroin on top of the mirror which is on the toilet." He later testified that he placed all the evidence in a Rubbermaid bin and made no statement about commingling substances. Thus, the appellate record does not support defendant's claim that People's exhibit No. 8 depicted three distinct piles of powder that the officer must have commingled.

¶ 55 Defendant further argues that by stipulating to the lab, trial counsel was prevented from questioning the chemist on the deviation of the scales. While the weight of the narcotics was only 0.5 gram over the 900-gram minimum amount, the chemist stipulated that the scales were calibrated prior to testing. "Illinois courts favor the stipulated testimony of forensic experts on the presence of controlled substances because stipulations can expedite the disposition of cases, simplify the issues and reduce expenses." *People v. Stewart*, 365 Ill. App. 3d 744, 749 (2006) (citing *People v. Woods*, 214 Ill. 2d 455, 468 (2005)). Therefore, because there was not prior commingling of distinct substances, defendant was not prejudiced by trial counsel's stipulation.

¶ 56                               D. Failure to Cross-Examine Officer Murphy
¶ 57 Defendant also argues that trial counsel had the opportunity to impeach Officer Murphy's testimony about his ability to view defendant throw a gun from the second-floor window. Defendant asserts that, from his stated vantage point, Officer Murphy could not have observed the window because the view is obstructed by a brick wall. However, defendant's trial counsel did cross-examine Officer Murphy, who provided a description of how much of defendant's body he observed and how far defendant had to lean out the window. The trial court found Officer Murphy's testimony credible, and a handgun was found on the roof, corroborating Officer Murphy's testimony. Trial counsel adequately questioned Officer Murphy and did not

act unreasonably or prejudice defendant.

¶ 58                           E. Failure to Inquire About Defendant's Employment Status

¶ 59      Defendant further claims that his trial counsel was ineffective because he did not inquire about defendant's employment status. Defendant received the minimum sentence for possession of narcotics with intent to deliver, and so whatever character reference defendant's alleged employment could have offered would not have mitigated defendant's sentence, and thus the exclusion of such reference did not prejudice him. Therefore, it is unnecessary to determine whether failing to introduce defendant's alleged employment status as a mitigating factor fell below the objective standard of reasonableness.

¶ 60                                      II. Sufficiency of the Evidence

¶ 61      Next, defendant challenges the sufficiency of the evidence for possession of 900 grams or more of heroin with intent to deliver.

¶ 62      Defendant argues that the evidence is not sufficient because constructive possession was not established where the State did not establish that defendant possessed knowledge of the narcotics or that the narcotics were in his immediate and exclusive control. *People v. Ray*, 232 Ill. App. 3d 459, 462 (1992).

¶ 63                                         A. Standard of Review

¶ 64      When determining the sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Woods*, 214 Ill. 2d 455, 470 (2005); *Ray*, 232 Ill. App. 3d at 461. If the court answers this inquiry in the negative, the defendant's conviction is reversed. *Woods*, 214 Ill. 2d at 470. However, a reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness's testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009); *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

¶ 65      When reviewing a conviction for possession of a controlled substance, the court must determine whether defendant had knowledge and possession of the narcotics. 720 ILCS 570/402 (West 2012) ("it is unlawful for any person knowingly to possess a controlled *** substance"). A defendant has constructive possession when he has the " 'intent and capability to maintain control and dominion' " over the narcotics, but does not have immediate personal control of them. *People v. Carodine*, 374 Ill. App. 3d 16, 25 (2007) (quoting *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992)). "Knowledge and possession are factual issues, and the trier of fact's findings on these questions will not be disturbed unless the evidence is so unbelievable, improbable, or palpably contrary to the verdict that it creates a reasonable doubt of the defendant's guilt." *People v. Brown*, 277 Ill. App. 3d 989, 998 (1996).

¶ 66      "Intent of delivery is rarely subject to direct proof. Consequently, such intent must usually be proven circumstantially." *People v. Little*, 322 Ill. App. 3d 607, 614 (2001). Factors for examining the sufficiency of circumstantial evidence include "(1) whether the quantity of cocaine possessed is too large to be reasonably viewed as being for personal consumption, (2) the degree of the cocaine's purity, (3) the possession of any weapons, (4) possession and

amount of cash, (5) possession of police scanners, beepers or cellular telephones, (6) possession of drug paraphernalia commonly associated with narcotic transactions, and (7) the manner in which the cocaine is packaged." *Little*, 322 Ill. App. 3d at 615 (citing *People v. Robinson*, 167 Ill. 2d 397, 408 (1995), *People v. Rivera*, 293 Ill. App. 3d 574, 576 (1997), and *People v. Beverly*, 278 Ill. App. 3d 794, 797 (1996)).

¶ 67                    B. Evidence Presented Against Defendant

¶ 68      The State argues that the facts supporting guilt include the fact that defendant fled from the police; no one else was observed in the area besides defendant and codefendant, who also fled the scene before he was apprehended with over $3000 in cash; defendant attempted to hide a gun from police by throwing it from a window in his residence to the neighboring roof; and the storefront from which narcotics were recovered is located just below defendant's self-admitted residence.

¶ 69      Defendant argues that People's exhibit No. 6 discredits Officer Mingari's testimony because it depicts an automatic door that would have closed before Officer Mingari would have been able to see through it. However, Officer Mingari was cross-examined about that door and testified that it did not automatically close. The trier of fact found that testimony to be credible, and we will not substitute our judgment for that of the trial court.

¶ 70      The storefront was vacant, and defendant had no reason to be present there unless he was in possession of the drugs; both defendant and codefendant were heard inside the storefront, both fled the scene, and both were the only individuals in the area. This evidence is enough to establish constructive possession. The recovery of Dormin, scales, and a quantity of drugs much too large for personal use is sufficient to establish the intent to deliver. This evidence, when viewed in the light most favorable to the prosecution, is sufficient to establish guilt of possession with intent to deliver beyond a reasonable doubt.

¶ 71                         III. Inconsistent Verdicts

¶ 72      Defendant argues that his conviction for possession of heroin with intent to deliver must be reversed due to inconsistent findings between defendant and codefendant, where the State presented more evidence against codefendant, who was found not guilty, than against defendant, who was found guilty.

¶ 73                         A. Standard of Review

¶ 74      Illinois courts have held that "where there is no plausible construction of the evidence which would furnish a reasonable basis for the finding of guilty as to one defendant and not guilty as to the other, the conviction must be reversed." *People v. Gonzales*, 67 Ill. App. 3d 215, 222 (1978). However, the acquittal of one codefendant does not raise a reasonable doubt as to the guilt of the other codefendant unless the evidence against both defendants is "identical in all respects." *People v. English*, 334 Ill. App. 3d 156, 167 (2002).

¶ 75                         B. Evidence Presented

¶ 76      The evidence presented against defendant and codefendant was not identical. Both codefendants were heard inside the storefront; both were the only individuals found at the location, and both were observed fleeing the scene.

¶ 77      However, defendant was in possession of a handgun, and Officer Mingari testified that he heard the slide being racked from inside the storefront. Defendant then ran up to his apartment to dispose of the handgun. Defendant also admitted that he resided in the apartment upstairs from the storefront. Living above the storefront positioned defendant to prevent theft of the drugs or to facilitate sales, further supporting the inference that he had control over the storefront.

¶ 78      Since the evidence presented against codefendant and defendant was not identical, and defendant's residence gave him a greater opportunity to exercise control over the drugs, we do not find that the trial court rendered inconsistent verdicts.

¶ 79                      IV. Convictions for Counts II and IV

¶ 80      Finally, defendant argues that this court should reverse his convictions of being an armed habitual criminal and of unlawful use of a weapon by a felon. Defendant argues that, from his stated vantage point, Officer Murphy could not have observed the window from which he claimed to have observed defendant throw the gun. When viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Ray*, 232 Ill. App. 3d at 461. Therefore, we affirm defendant's convictions for armed habitual criminal and unlawful use of a weapon by a felon.

¶ 81      Defendant argues that the photograph identified as People's exhibit No. 10 indicates that Officer Murphy's vantage point, where he marked an "X" on the exhibit, made it impossible to observe the window. However, it is not clear from the exhibits that Officer Murphy could not have observed the window, and the overhead view of the photograph in People's exhibit No. 10 does not provide a reasonable basis for that inference. Identification by a single witness is sufficient to support a conviction if the defendant is viewed under circumstances permitting a positive identification. *People v. Gabriel*, 398 Ill. App. 3d 332, 341 (2010). Officer Murphy heard the window open, looked up to observe the defendant throw the gun, and then immediately went to the apartment to identify him after the other officers had detained him. In addition, the gun, which Officer Murphy described, was recovered on the roof. Further, Officer Murphy was vigorously questioned at trial, and the trial court found his testimony to be credible. We will not substitute the judgment of the trier of fact with our own with regard to the credibility of witnesses or the weight to be given to each witness's testimony. *Jackson*, 232 Ill. 2d at 281. For the foregoing reasons, we affirm defendant's convictions for armed habitual felon and unlawful use of a weapon by a felon.

¶ 82                            CONCLUSION

¶ 83      For the foregoing reasons, we affirm defendant's convictions of unlawful possession of 900 grams or more of narcotics with intent to deliver, being an armed habitual criminal, and unlawful use of a weapon by a felon. First, defendant was not denied effective assistance of counsel. Second, when viewed in the light most favorable to the prosecution, the State established guilt of possession with intent to deliver beyond a reasonable doubt. Third, the trial court did not render inconsistent verdicts because defendant and codefendant were not tried on identical facts. Finally, we affirm defendant's convictions for armed habitual criminal and unlawful use of a weapon by a felon, because the trial court found the officer's eyewitness testimony credible, and we will not substitute our judgment for that of the trier of fact with

regard to the credibility of the witness.

¶ 84          Affirmed.