Corrected

2023 IL App (1st) 200435

FIRST DIVISION
September 25, 2023

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-20-0435

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2018-CR-118301 |
| | ) | |
| TRAMELL BROOKS, | ) | Honorable |
| | ) | Stanley Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.

Justices Lavin and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1    After a bench trial in the circuit court of Cook County, the defendant, Trammell Brooks, was found guilty of being an armed habitual criminal (720 ILCS 5/24-1.7 (West 2016)) and sentenced to eight years' imprisonment. On appeal, the defendant challenges the sufficiency of the evidence to convict him, arguing that the State failed to prove beyond a reasonable doubt that he knowingly possessed a firearm, which resulted in his conviction as an armed habitual criminal. In addition, the defendant argues, for the first time on appeal, that the armed habitual criminal statute (*id.*) under which he was convicted is unconstitutional, as applied to him, as it violates the second amendment of the United States Constitution (U.S. Const., amend II). Specifically, the defendant

contends that under the new test for evaluating gun laws established by the recent decision of the United States Supreme Court in *New York State Rifle & Pistol Ass'n, v. Bruen*, 597 U.S. \_\_\_, 142 S. Ct. 2111 (2022), there is no historical tradition of prohibiting firearm possession by nonviolent felons. Accordingly, the defendant asserts that because his armed habitual criminal conviction was entirely based upon his possession of a firearm after he had been convicted of two prior nonviolent felonies, the statute is unconstitutional as applied to him. For the following reasons, we affirm.

¶ 2                                   I. BACKGROUND

¶ 3      In January 2018, the defendant was charged with one count of being an armed habitual criminal (720 ILCS 5/24-1.7 (West 2016)) (count I) and two counts of unlawful possession of a weapon by a felon (UPWF) (*id*. § 24-1.1(a)) (count II and III), on the basis that he "knowingly and intentionally possessed" a .32-caliber revolver after having been previously convicted of two qualifying felonies, namely manufacture or delivery of "other amount of narcotics Schedule I and II" (in case No. 08-CR-2114501) and UPWF (in case No. 09-CR-0968201). In addition, the defendant was charged with one count of violating the Firearm Owners Identification Card Act (FOID Card Act) (430 ILCS 65/2(a)(1) (West 2016)) for failing to have in his possession a firearm owners identification (FOID) card while possessing the .32-caliber revolver (count IV).

¶ 4      On November 18, 2019, the defendant proceeded with a bench trial at which the following relevant evidence was adduced. Three Chicago police officers testified that at about 5 p.m. on December 18, 2017, together with numerous units from the Maywood and the Chicago police departments, they executed a search warrant at 1914 Railroad Avenue, Apartment 1E, in Maywood, Illinois.

¶ 5      Officer John Zinchuk first testified that he was assigned as the breach and evidence officer and that his duties included using a ram to open the entry door, as well as photographing

the apartment and inventorying any recovered evidence.

¶ 6    Officer Zinchuk explained that when he arrived at the scene, he observed that the apartment was on the first floor of "a corner multiunit" building. Maywood police officers were assigned to the front door, while Chicago police officers, including Officer Zinchuk were assigned to the back. Officer Zinchuk knocked on the back door and announced his office but received no response. After obtaining permission from his supervisor, Officer Zinchuk forced open the door using the ram. Because other officers entered the premises first to secure it, he was the last to enter.

¶ 7    Once inside, Officer Zinchuk observed the defendant being detained "in the living room/dining room area near the bedroom door." Officer Zinchuk described the residence as a small one-bedroom, one bathroom apartment with the kitchen, living room, and dining room all in "one wide open space." He stated that apart from the defendant and a small dog, there was no one else inside the apartment.

¶ 8    Officer Zinchuk took photographs of the premises before helping the other officers conduct a systematic search of the apartment. During this search, on a bookshelf inside the bedroom, Officer Zinchuk discovered a digital scale; a jar with a "a green leafy substance," which he suspected was marijuana; "narcotics packaging"; and a plate with white powder, which he suspected was cocaine.[1]

¶ 9    As evidence officer, he was then informed of other contraband that was discovered inside the apartment. Officer Zinchuk photographed and inventoried all the recovered items, including, *inter alia*, a safe, which was discovered in the bedroom. According to Officer Zinchuk, inside the safe, other officers found a box with a loaded revolver, and numerous letters addressed to the

---

[1]It is undisputed that the State did not charge the defendant with any drug-related offenses arising from the discovery of these items.

defendant. At trial, Officer Zinchuk identified photographs of the scene and the recovered contraband.

¶ 10    On cross-examination, Officer Zinchuk acknowledged that while inside the apartment, he did not hear the defendant say anything about the recovered revolver. He also admitted that he did not request that the revolver be checked for fingerprints or DNA.

¶ 11    Chicago police officer Edwin Utreras next testified that on December 18, 2017, he was the first to enter the apartment through the back door after it was breached by Officer Zinchuk. Once inside, he placed the defendant into custody and proceeded to search the apartment.

¶ 12    Officer Utreras agreed with Officer Zinchuk that the apartment contained only one bedroom. He further stated that, among other things, inside that bedroom he discovered a safe underneath the bed. According to Officer Utreras, the safe was unlocked, so all he had to do was turn the knob to open it. Inside the safe, the officer discovered a blue box with a small letter "G," which contained a loaded .32-caliber revolver. In addition, he discovered several documents with the defendant's name, including (1) the defendant's birth certificate; (2) a ComEd bill; (3) a Nicor bill; and (3) letters from the Internal Revenue Service, Computers Systems Institute, Illinois Client Enrollment Services, and Sexner and Associates, Attorneys at Law. All of these documents were directed to the defendant at the Maywood apartment address.

¶ 13    Officer Utreras acknowledged that the safe also contained a second letter from the Internal Revenue Service addressed to the defendant but at a different address, namely 211 North Kolin Avenue in Chicago. The officer also admitted that at least one of the documents he found inside the safe was from 2014, three years before the search warrant was executed. He could not recall the dates on any of the remaining documents or whether any of the letters addressed to the

defendant had been opened before the police arrived.

¶ 14    Officer Utreras further testified that all the items recovered at the scene were subsequently inventoried and photographed by Officer Zinchuk. Officer Utreras then identified photographs of the safe and the revolver. He also identified photographs of the defendant's birth certificate, and the letters addressed to the defendant, which were found in the safe.

¶ 15    Officer Utreras next averred that while still at the apartment, at about 7:30 p.m., after reading the defendant his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) , the defendant told him ("in summary, not verbatim") that he needed the revolver for his protection. On cross-examination, the officer admitted that he never wrote down the defendant's statement and that it was not recorded by his body-worn camera. He further acknowledged that he did not ask the defendant any follow-up questions about the revolver.

¶ 16    Chicago police officer Mark Hernandez next testified that on December 18, 2017, he was part of the back door entry team executing the search warrant at 1914 Railroad Avenue, Apartment 1E, in Maywood. Officer Hernandez averred that once inside the apartment, he was assigned to watch the defendant while other officers searched the premises. Officer Hernandez performed a pat down search of the defendant upon which he discovered a set of keys inside the defendant's pocket. Officer Hernandez tested the keys on the apartment's front door and determined that they unlocked it. At trial, the officer identified a photograph of the recovered keys, showing that they fit inside the front door lock.

¶ 17    After the testimony of the three officers, the State introduced into evidence the photographs taken by Officer Zinchuk and the physical documents that were discovered inside the safe.[2] The State also introduced into evidence the certified convictions for the defendant's

---

[2] According to the defendant, the State failed to impound all of its exhibits after trial and then lost them. Since then, however, the State has provided the defendant with an accurate recreation of some of

two prior felony convictions, namely: (1) manufacture or delivery of "other amount of narcotics, Schedule I and II" (case No. 08-CR-2114501), and (2) UPWF (case No. 09-CR-0968201).[3]

¶ 18    After the State rested, the defense moved for a directed finding. The circuit court granted the motion as to count IV of the indictment, charging the defendant with a violation of the FOID Card Act (430 ILCS 65/2(a)(1) (West 2016)). The court found that the State failed to prove the defendant guilty of this charge because it presented no evidence whatsoever that, at the time the warrant was executed, the defendant did not possess a FOID card.

¶ 19    Subsequently, in its case-and-chief, the defense presented the testimony of the defendant's brother, Keiton Webster (Webster). Webster stated that on December 17, 2018, he lived at 1914 Railroad Avenue, Apartment 1E, in Maywood with his fiancée (Crystal Loggins), his cousin (Tyrese Webster), his cousin's wife (Rachel Webster), and the defendant. Webster averred that the apartment had two bedrooms, which were separated by the living room and were about 15 feet apart. Webster stated that he and his fiancée used the bedroom on the right, while Tyrese and his wife used the bedroom on the left. According to Webster, the defendant had no access to either of the bedrooms and, instead, slept on the living room sofa and kept his

those exhibits. On March 23, 2023, we granted the defendant's motion to supplement the record on appeal with the recreated exhibits. The defendant has since filed three volumes of supplemental record, which contain only some of the photographs taken by Officer Zinchuk. The supplemental record, however, does not contain any of the physical documents recovered by the police from inside the safe. To the extent that the parties challenge the dates on those documents, we can consider only those that are visible from the photographs in the recreated exhibits. See *People v. Garcia*, 2017 IL App (1st) 133398, ¶ 35 ("this court cannot consider evidence that is not part of the record"); *People v. Heaton*, 266 Ill. App. 3d 469, 476 (1994) ("[E]vidence which is not part of the record on appeal is not to be considered by the reviewing court ***."). These include only (1) a Nicor letter, postmarked August 13, 2014; (2) the defendant's birth certificate issued on August 27, 2013; and (3) a letter from the Computer Systems Institute addressed to the defendant at the apartment and postmarked July 19, 2014.

[3] While the certificates of conviction are not part of the supplemental record on appeal, the defendant does not challenge their validity. The indictment and the presentence investigation report (PSI) both confirm the defendant's convictions for these two offenses.

belongings in the front closet.

¶ 20    Webster further averred that on December 17, 2018, he held a FOID card and owned a .32-caliber revolver with a black handle, which he obtained from his grandfather's house after his grandfather died. Webster stated that he kept the revolver inside a small box in a safe, which he kept in the closet of his bedroom. Webster averred that the safe could not be opened without a combination or a key. He denied that the box containing the revolver was blue and had a small letter "G" on it. Instead, he claimed that he kept this blue box on his bedroom bookshelf.

¶ 21    According to Webster, the defendant neither had access to the safe nor to the revolver, and Webster never observed him handling the weapon. In addition, the defendant did not keep his birth certificate inside the safe. In fact, no documents were kept there. Instead, according to Webster, the letters and the documents recovered by the police were kept on the kitchen shelves.

¶ 22    Although Webster could not exactly recall when he last saw the revolver inside the safe, he believed that it was a couple of days before the search warrant was executed, when he placed his rent money inside the safe.

¶ 23    Webster next testified that he was not present in the apartment when the search warrant was executed because he was working driving a Pace van. When he returned home, he discovered the entire apartment, including his bedroom, had been ransacked and destroyed. According to Webster, his safe had been removed from his bedroom closet and had been pried open. Webster claimed that the photograph of the safe introduced by the State at trial showed that the safe had been pried open.[4]

¶ 24    On cross-examination, Webster admitted that the digital scale, the jar with the green leafy substance, and the baggies, which were recovered from the bookshelf in his bedroom belonged to

---

[4] The supplemental record on appeal contains this photograph. However, because in the photograph the door of the safe is closed, it is impossible to tell whether it was tampered with.

him. He also admitted that the plate with the white powder was from the apartment but claimed that he did not know whether it was in his bedroom at the time of the search. In addition, Webster denied that the white powder was his.

¶ 25    After the parties' closing arguments, the circuit court found the defendant guilty of one count of being an armed habitual criminal (count I) and two counts of UPWF (counts II and III). The court then merged counts II and III into the armed habitual criminal count.

¶ 26    In finding the defendant guilty, the court stated that it "had no doubt whatsoever" that the defendant possessed the revolver at the time of his arrest. In coming to this conclusion, the court rejected the defendant's theory that the revolver belonged to Webster. The court found that Webster's testimony was an effort "to help his brother out" by taking responsibility for the weapon and that his suggestion that the police moved things around in the apartment and pretended to find everything inside the safe "defie[d] belief."

¶ 27    The court further rejected the assertion that the police fabricated the defendant's admission to owning the revolver. Instead, the court concluded that the defendant's explanation to Officer Utreras that he needed the weapon "for protection" was "obviously self-serving."

¶ 28    In addition, the court found relevant that the gun was discovered inside the safe with numerous documents addressed to the defendant. In commenting on those documents, the court first indicated that their recency was not relevant because "people keep things that are important for them to keep." Specifically, the court pointed out that while the defendant's birth certificate was issued on August 27, 2013, it was the type of important document that someone would want to keep in a safe.[5]

¶ 29    In sum, the court found that the presence of the defendant's birth certificate and mail,

---

[5] The court further commented on the remaining documents found in the safe, noting that except for the ComEd bill, which was from 2017, the remainder of the documents were three to four years old.

regardless of its recency, next to the revolver inside the safe of a small one-bedroom apartment, along with the defendant's admission that "he had the gun for his protection" and the fact that he had keys to the apartment, established that the defendant knowingly possessed the weapon.

¶ 30     At the subsequent sentencing hearing, the State sought the imposition of a sentence at the high end of the Class X range.[6] The State argued that the evidence at trial established not only that the defendant, a prior felon, had a revolver but also that he was in possession of drugs and drug paraphernalia at the time of his arrest. The State also argued that the defendant was not unfamiliar with the criminal justice system and that he had been given opportunities for rehabilitation in the past. In support, the State pointed out that, according to the presentence investigation report (PSI), in addition to the two felonies that were used as predicates for his armed habitual criminal conviction, the defendant had another six felony convictions, including two forgery[7] and four drug convictions.[8] According to the State, the PSI further reflected that, at the time of his sentencing hearing, the defendant also had a pending felony case in Maywood under case No. 19-CR-0158701. In addition, according to the PSI, the defendant himself acknowledged that he has a drug problem and that he has used marijuana daily since he was 18 years old.

¶ 31     In response, defense counsel asked the court to impose the minimum six-year term. In

---

The court nonetheless indicated that the recency was irrelevant as each document was "important" to the defendant. As noted above, because these physical documents are not part of the record on appeal, and without any witness testimony to the document's contents, we cannot confirm the dates discussed by the circuit court, we will not consider those dates in reviewing the sufficiency of the evidence used to convict the defendant. See *Garcia*, 2017 IL App (1st) 133398, ¶ 35.

[6] The sentencing range for a Class X felony is between 6 and 30 years. See 730 ILCS 5/5-4.5-25 (West 2016).

[7] According to the PSI, the defendant was sentenced to two years in prison for these offenses.

[8] The PSI reveals the following sentences were imposed for these drug offenses: (1) 1 year in prison for possession of a controlled substance in case No. 06-CR-0202301, (2) 24 months of probation for possession of a controlled substance in case No. 05-CR-0510901, (3) 1 year in prison for possession of a controlled substance in case No. 02-CR-2739401, and (4) 1 year of probation for possession of less than 15 grams of heroin in case No. 02-CR-2605701.

mitigation, counsel conceded that the defendant is familiar with the criminal justice system but argued that he "does not have a history of violence." Counsel further pointed out that the defendant had potential for rehabilitation because he was 36 years old, he had graduated from high school and completed a computer training course, he was gainfully employed at a temp agency and working at Long John Silver's, and he had a 16-year-old daughter. Counsel further argued that any drugs and drug paraphernalia that were found during the execution of the search warrant were for the defendant's personal use and that the defendant was not arrested for anything he did, but rather in his own apartment, after the police sought him out.

¶ 32    After hearing the arguments in aggravation and mitigation, the circuit court sentenced the defendant to eight years imprisonment, only two years above the statutory minimum. The defendant now appeals.

¶ 33                                II. ANALYSIS

¶ 34                        1. Sufficiency of the Evidence

¶ 35    On appeal, the defendant first challenges the sufficiency of the evidence used to convict him. He argues that the State failed to prove beyond a reasonable doubt that he possessed the firearm that resulted in his conviction as an armed habitual criminal. For the following reasons, we disagree.

¶ 36    It is well-settled that when reviewing a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *People v. Jones*, 2023 IL 127810, ¶ 28; *People v. Brown*, 2013 IL 114196, ¶ 48; *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). This standard of review applies regardless of whether the evidence is direct or circumstantial and regardless of whether the

defendant received a bench or a jury trial. *People v. Cline*, 2022 IL 126383, ¶ 25.

¶ 37    It is the responsibility of the trier of fact to determine witness credibility, resolve conflicts in testimony, and to weigh the evidence presented at trial and draw reasonable inference therefrom. See *Brown*, 2013 IL 114196, ¶ 48; see also *People v. Pryor*, 372 Ill. App. 3d 422, 430 (2007). In weighing the evidence, the fact finder is not required to disregard the inferences that naturally flow from that evidence, nor must it search for any possible explanation consistent with innocence and raise it to the level of reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). A criminal conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Brown*, 2013 IL 114196, ¶ 48.

¶ 38    To prove the defendant guilty of being an armed habitual criminal, the State was required to prove that he possessed a firearm after being convicted of two or more qualifying offenses. See 720 ILCS 5/24-1.7 (West 2016). On appeal, the defendant only challenges the sufficiency of the evidence proving his possession of the firearm.

¶ 39    While possession can be either actual or constructive, where, as here, the gun was found near, and not on the defendant's person, the State must prove that the defendant had constructive possession of the firearm. *Jones*, 2023 IL 127810, ¶ 30. Constructive possession exists where the defendant (1) had knowledge of the presence of the weapon and (2) exercised immediate and exclusive control over the area where the weapon was found. *Id.*; see also *People v. Faulkner*, 2017 IL App (1st) 132884-B, ¶ 39.

¶ 40    Knowledge may be demonstrated by evidence of the defendant's "acts[, declarations,] or conduct, from which it can be inferred that he knew the contraband existed in the place where it was found." *People v. McCurine*, 2019 IL App (1st) 160817, ¶ 24; *Faulkner*, 2017 IL App (1st)

132884-B, ¶ 39; see also *People v. Ross*, 407 Ill. App. 3d 931, 936 (2011).

¶ 41    Control is established when the defendant has the " 'intent and capability to maintain control and dominion' " over the weapon, "even if he lacks personal present dominion over it." *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17 (quoting *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992)); see also *People v. Wilkerson*, 2016 IL App (1st) 151913, ¶ 65; *Faulkner*, 2017 IL App (1st) 132884-B, ¶ 39. "Habitation in the premises where contraband is discovered is sufficient evidence of control to constitute constructive possession." *Spencer*, 2012 IL App (1st) 102094, ¶ 17; see also *People v. Terrell*, 2017 IL App (1st) 142726, ¶ 19. Proof of residency in the form of mail, rent receipts, or utility bills is " 'relevant to show the defendant lived on the premises and therefore controlled them.' " (Internal quotation marks omitted.) *Spencer*, 2012 IL App (1st) 102094, ¶ 17 (quoting *People v. Cunningham*, 309 Ill. App. 3d 824, 828 (1999)). In addition, "[t]he law is clear that the exclusive dominion and control required to establish constructive possession is not diminished by evidence of others' access to the contraband." (Internal quotation marks omitted.) *People v. Givens*, 237 Ill. 2d 311, 338 (2010).

¶ 42    In the present case, the evidence at trial established that the defendant resided in the one-bedroom apartment where the revolver was discovered. The defendant had keys and the ability to enter and exit the apartment, giving him immediate access to and control over its contents. *Jones*, 2023 IL 127810, ¶ 30. Moreover, the defendant was the only individual inside the apartment when the search warrant was executed. At that time, he was observed by Officer Zinchuk "near the bedroom door" of the room in which the revolver was ultimately found. The revolver itself was discovered under the bed inside a safe, which contained multiple documents, including the defendant's birth certificate and numerous letters addressed to him at the instant address. Most importantly, when confronted with the discovery of the revolver, upon being Mirandized, the

defendant himself admitted to Officer Utreras that he needed the gun "for protection."

¶ 43    Viewing this evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found that the defendant had both knowledge of the revolver and maintained control over the area where it was found. We therefore conclude that there was sufficient evidence of the defendant's constructive possession of the firearm to sustain his conviction as an armed habitual criminal. See, *e.g.*, *Spencer*, 2012 IL App (1st) 102094, ¶ 17 (holding that evidence was sufficient to show that the defendant constructively possessed a revolver found on top of a kitchen cabinet of a single family home, where, *inter alia*, the defendant, who was present during the search, made an incriminating statement on why he needed the weapon and the police discovered a set of keys that operated the exterior doors of the house, as well as the defendant's identification card listing the address of the house as his residence); *People v. Hudson*, 2023 IL App (1st) 192519, ¶¶ 18, 24-25 (finding that there was sufficient evidence of constructive possession where, *inter alia*, the defendant was present during the execution of the search warrant, the weapon was discovered near two pieces of mail addressed to him, and he admitted to having the weapon); *People v. Jackson*, 2019 IL App (1st) 161745, ¶¶ 3, 30 (holding that there was sufficient evidence of constructive possession of narcotics discovered in a hidden compartment in the closet of the first floor unit of a multi-unit apartment building where, *inter alia*, the defendant owned the apartment building, utilities to the building were in the defendant's name, and the defendant was present in the basement unit, but not the first-floor unit, when the search warrant was executed); *People v. Spann*, 332 Ill. App. 3d 425, 437 (2002) (holding that there was sufficient evidence of constructive possession of narcotics where the defendant had a key to the apartment and made statements that he paid rent and stayed there).

¶ 44    The defendant nonetheless argues that the State failed to establish that he had control over

either the bedroom or the safe where the revolver was found. Specifically, the defendant contends that Webster's testimony established that the apartment had two bedrooms and that the bedroom in which the safe and revolver were discovered was neither occupied nor controlled by the defendant. In addition, the defendant points out that Webster testified that the revolver belonged to him and that the defendant never used it or kept any personal documents inside the safe. The defendant asserts that Webster's testimony establishes that the police either did not see the second bedroom or that they lied about the size of the apartment and therefore also about finding the documents with the defendant's name inside the safe. In this respect, the defendant asks that we take judicial notice of several extraneous Internet documents that are *dehors* the record, which he asserts conclusively establish that, at the time of the search, the apartment had two bedrooms.[9]

¶ 45    We decline the defendant's request. Taking judicial notice of any facts that are outside of the record and which were not considered by the trial judge in determining the defendant's guilt or innocence is inappropriate at this stage of review. As our supreme court has aptly explained, a sufficiency of evidence analysis "must be limited to evidence actually admitted at trial, and judicial notice cannot be used to introduce new evidentiary material not considered by the fact finder during its deliberations," as it would "wholly ignore[ ] the role of a reviewing court" in examining the defendant's guilt. *Cline*, 2022 IL 126383, ¶¶ 32-33.

¶ 46    That said, if the defendant believes that these documents unequivocally establish that, when the search warrant was executed, the apartment contained two bedrooms, instead of one, thereby impeaching the testimony of the two police officers, and giving more credence to Webster's version of events, to such an extent that there is a reasonable probability that the outcome of his

---

[9] These documents purport to include (1) a warranty deed from an online search of the Cook County Recorder of Deeds, (2) an MLS listing for the property, and (3) a 2019 YouTube video by Coldwell Banker Realty advertising the apartment for rent.

trial would have been different, nothing prevents him from raising this issue in a postconviction proceeding, in the context of an ineffective assistance of trial counsel claim.

¶ 47    As it stands, the record before us shows only that the trial judge was presented with contradictory testimony regarding the size of the apartment, the location of the safe, the safe's contents, and the defendant's ability to access or control both. In addition, the trial judge heard testimony from Officer Utreras that the defendant made an explicit admission (albeit one that was never memorialized or recorded) to keeping the gun for his own protection. Having heard this testimony and having viewed the photographs of the apartment submitted into evidence, the trial court gave credence to the police officers and found Webster's claims "defie[d] belief." Because the trial judge was in a superior position to observe the demeanor of the witnesses and assess their credibility, we must defer to his findings and may not substitute our judgment for his. *Brown*, 2013 IL 114196, ¶ 48; see also *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007); see also *People v. Pryor*, 372 Ill. App. 3d 422, 430 (2007) (where the evidence produces "conflicting inferences" is the trier of fact's responsibility to resolve that conflict); *Wilkerson*, 2016 IL App (1st) 151913, ¶ 65 (because "[k]nowledge and possession are factual issues *** the trier of fact's findings on these questions will not be disturbed unless the evidence is so unbelievable, improbable, or palpably contrary to the verdict that it creates a reasonable doubt of the defendant's guilt").

¶ 48    In coming to this conclusion, we have considered the numerous decisions cited by the defendant, where constructive possession was reversed on appeal for insufficient evidence. See *People v. Wise*, 2021 IL 125392; *People v. Davis*, 2021 IL App (3d) 180146; *Terrell*, 2017 IL App (1st) 142726; *People v. Fernandez*, 2016 IL App (1st) 141667; *People v. Tates*, 2016 IL App (1st) 140619; People v. *Maldonado*, 2015 IL App (1st) 131874; *People v. Alicea*, 2013 IL App (1st)

112602; *People v. Sams*, 2013 IL App (1st) 121431; *People v. McIntyre*, 2011 IL App (2d) 100889; *People v. Orta*, 361 Ill. App. 3d 342, 349 (2005); *People v. Macias*, 299 Ill. App. 3d 480 (1988). However, because none of these decisions involve an admission by the defendant regarding the recovered contraband, we find that they are inapposite.

¶ 49    The only case cited by the defendant that involves an admission is *People v. Walker*, 2020 IL App (1st) 162305. In that case, the defendant was one of five people present when a search warrant was executed in a three-bedroom apartment. *Id.* ¶¶ 3-5. The police found the defendant asleep on a make-shift bed in the dining room. *Id.* ¶ 5. During the search, the officers recovered two boxes of ammunition from a top dresser drawer in one of the three bedrooms. *Id.* ¶ 6. Another person was present in that bedroom during the search, and nothing was found connecting the defendant to that room. *Id.* ¶¶ 7, 11. In addition, the defense presented multiple witnesses who testified that the defendant did not live or keep any belongings in the apartment. *Id.* ¶ 14. The defendant, however, admitted to the police that the ammunition was his. *Id.* ¶ 6.

¶ 50    On review, the appellate court held that the defendant's confession was "insufficient to prove *corpus delicti* of an offense." *Id.* ¶ 22. In coming to this conclusion, the court found relevant that "the only connection that the defendant had to the bullets was that he was sleeping in the apartment where they were found." *Id.* ¶ 25.

¶ 51    In contrast, in the instant case, there were numerous items linking the defendant to the residence, including keys to the apartment, which were inside his pocket, and his birth certificate and letters addressed to him at the residence, which were discovered inside the safe next to the revolver. More importantly, unlike *Walker*, the defendant was the only person inside the apartment and was found standing next to the door of the sole bedroom, from which the officers subsequently recovered the revolver. Accordingly, we find that *Walker* does not apply.

16

¶ 52    In his final attempt to challenge the sufficiency of the evidence, the defendant asserts that

the State did not present any fingerprint or DNA evidence from the items recovered to show that

he handled the revolver and the safe. He asserts that without such evidence the State failed to prove

that he had control over the firearm. Contrary to the defendant's position, however, the State was

not required to present such evidence because witness testimony from the police officers

describing where the revolver was found sufficiently linked the defendant to it. *People v.

Campbell*, 2019 IL App (1st) 161640, ¶ 33 ("It is settled law that if witnesses' testimony is

otherwise credible, the State [is] not required to present additional physical evidence *** link[ing]

the defendant to the gun." (Internal quotation marks omitted.)). Here, as already noted above, the

trial judge heard the testimony of the police officers and considered the photographs of the crime

scene, corroborating their testimony. This evidence alone was sufficient for the court to determine

that the defendant had both knowledge and control over the gun.

¶ 53    Accordingly, we conclude that the circuit court properly found the defendant

constructively possessed the firearm and was therefore guilty of being an armed habitual

criminal. *Brown*, 2013 IL 114196, ¶ 48.

¶ 54                        2. Constitutionality of Armed Habitual Criminal Statute

¶ 55    The defendant next argues, for the first time on appeal, that under the new test articulated

by the United States Supreme Court in *Bruen*, 597 U.S. ___, 142 S. Ct. 2111, the armed habitual

criminal statute (720 ILCS 5/24-1.7 (West 2016))) under which he was convicted is

unconstitutional, as applied to him, as it violates the second amendment (U.S. Const., amend II).

He argues that the statute impermissibly criminalized his simple possession of a firearm

exclusively on the basis of his two prior nonviolent felony convictions.

¶ 56    In response, the State initially contends that the defendant's as-applied challenge is

forfeited because he failed to raise it in the circuit court. The defendant, in turn, concedes that he did not raise this issue before the circuit court but nonetheless asserts that the record below is sufficiently developed and contains all the facts necessary for our review of his as-applied constitutional challenge. After a review of the record, we agree with the defendant and decline the State's invitation to find the issue forfeited.

¶ 57    Ordinarily, a defendant must present an as-applied constitutional challenge to a statute at trial in order to develop the record as it pertains to the specific facts and circumstances of his claim. *People v. Thompson*, 2015 IL 118151, ¶ 37 (because "an as-applied constitutional challenge is dependent on the particular circumstances and facts of the individual defendant" it is "paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review"). However, our supreme court has held that where "[a]ll the facts and circumstances to decide the defendant's claim *** are already in the record" the claim may be raised and reviewed on appeal for the first time even absent a prior evidentiary hearing. *People v. Holman*, 2017 IL 120655, ¶¶ 29-32, *overruled on other grounds by People v. Wilson*, 2023 IL 127666, ¶ 42; *People v. Martin*, 2018 IL App (1st) 152249, ¶¶ 12-13 ("[W]here the evidentiary record developed below is sufficient, the constitutionality of a statute may be challenged on appeal."); see, *e.g.*, *People v. Robinson*, 2011 IL App (1st) 100078, ¶¶ 12, 17, 29 (considering an as-applied constitutional challenge raised for the first time on appeal).

¶ 58    Contrary to the State's position, this principle is not limited to cases involving as-applied challenges to juvenile sentences under the eighth amendment. In fact, this appellate court has previously held that it could consider a second amendment as-applied challenge to the armed habitual criminal statute for the first time on direct appeal despite the lack of an evidentiary hearing, where the record below was sufficiently developed. See *Martin*, 2018 IL App (1st)

152249, ¶¶ 12-13.

¶ 59    In the present case, the defendant's as-applied challenge is based on facts already in the record, *i.e.*, the defendant's simple possession of the firearm and the nonviolent nature of his two prior predicate felony offenses. Both the charging document and the evidence at trial unequivocally show that the defendant's mere constructive possession of the firearm was the basis for his armed habitual criminal conviction. Moreover, it is undisputed that the defendant's prior conviction for manufacture or delivery of "other amount of narcotics Schedule I and II" and his subsequent conviction for UPWF, were used as the predicate offenses for his armed habitual criminal charge. During sentencing, the trial judge described these offenses as "a delivery charge" and "a weapon violation" respectively. The PSI, which the State acknowledged in open court correctly reflects the defendant's criminal history, confirms the accuracy of the trial court's description of these two predicate convictions. The PSI further shows that the defendant's remaining criminal history included only nonviolent offenses, namely two forgery and four drug possession convictions.

¶ 60    Accordingly, under this record, we fail to see which additional facts must be adduced at an evidentiary hearing, which would preclude our review of the defendant's constitutional challenge. The State itself does not identify any such omitted facts but instead conjectures that there is "no telling what additional, compelling evidence" it could have produced to challenge the defendant's simple possession of the firearm or his nonviolent felony record.

¶ 61    The State, however, fails to realize that it alone has discretion to decide what charges to bring against the defendant and that the only conduct it charged in the instant case was the defendant's illegal possession of the firearm. *People v. Jamison*, 197 Ill. 2d 135, 162 (2001); *People v. White*, 2011 IL 109616, ¶ 25 (the State is endowed "with the exclusive discretion to

decide which *** charges shall be brought" or "whether to prosecute at all" (internal quotation marks omitted)). Moreover, the State cannot deny that during sentencing, it affirmed the accuracy of the PSI and that it never disputed defense counsel's description of the defendant's record as nonviolent. Nor did the State ever argue at trial or during the sentencing hearing that the defendant's predicate offenses were violent. See *People v. Jones*, 2016 IL 119391, ¶ 40 (noting that "a PSI, with its statutorily mandated requirements" is "a reliable source of a defendant's criminal history"); *People v. Williams*, 149 Ill. 2d 467, 491, 493 (1992) (recognizing a PSI as a "reliable source" for "inquiring into a defendant's criminal history" and noting that "[a]ny claimed deficiency or inaccuracy within [it] must first be brought to the attention of the sentencing court," because "failure to do so results in wavier of the issue on review"); *People v. Matthews*, 362 Ill. App. 3d 953, 957 (2005) (same). The State cannot now wish away its choices or ignore the charges and the evidence that it alone introduced and relied upon at trial and at the sentencing hearing.

¶ 62     Accordingly, under the record before us, we conclude that the defendant's claim is properly raised and that we may consider its merits. See *Holman*, 2017 IL 120655, ¶¶ 29-32; *Robinson*, 2011 IL App (1st) 100078, ¶¶ 12, 17, 29; *Martin*, 2018 IL App (1st) 152249, ¶¶ 12-13 ("[W]here the evidentiary record developed below is sufficient, the constitutionality of a statute may be challenged on appeal.").

¶ 63     That said, for the following reasons, we find that neither *Bruen* nor the Supreme Court's previous second amendment jurisprudence supports the defendant's as-applied challenge to the armed habitual criminal statute.

¶ 64     Statutes carry a strong presumption of constitutionality. See *People v. Legoo*, 2020 IL 124965, ¶ 29; see also *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). "To overcome this

presumption, the party challenging the statute must clearly establish that it violates the constitution." *Sharpe*, 216 Ill. 2d at 487. A reviewing court has "a duty to construe a statute in a manner that upholds its validity and constitutionality if it reasonably can." *People v. Graves*, 207 Ill. 2d 478, 482 (2003); see also *Legoo*, 2020 IL 124965, ¶ 29. Our review of whether the armed habitual criminal statute is constitutional as applied to the defendant is *de novo*. See *People v. Davis*, 408 Ill. App. 3d 747, 749 (2011).

¶ 65    The second amendment of the United States constitution provides that "[a] well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend II.

¶ 66    Throughout the twentieth century the prevailing understanding of the second amendment, at least in some way, related to militia service. See *United States v. Miller*, 307 U.S. 174, 179 (1939). This understanding changed in 2008 with the United States Supreme Court decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), which interpreted the second amendment as establishing an individual right. *Heller* identified the "core" of the second amendment as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Roughly two years later in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court extended the second amendment's individual right to keep and bear arms to the states under the fourteenth amendment.

¶ 67    After *Heller* and *McDonald*, "[e]very circuit court" in the country, developed the "same two-step test" for evaluating second amendment challenges to gun regulations. *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) (citing *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2126-27); see also *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019), *abrogated by Bruen*, 597 U.S. ___142 S. Ct. 2111. Under the first step, the threshold question was whether the regulated

activity fell within the scope of the second amendment. *Id.* At this stage, "[t]he government could defend the challenged restriction" by showing that the regulated activity fell "outside of the scope of the Second Amendment as originally understood." *Atkinson*, 70 F.4th at 1020. If history proved inconclusive or suggested that the regulated activity was not "categorically unprotected" courts proceeded to the second step, whereupon they conducted a means-ends analysis, employing either strict or intermediate scrutiny and weighing the severity of the regulation against the ends the government sought to achieve. *Id.*

¶ 68    Recently, however, in *Bruen*, the Supreme Court announced a new analytical framework for evaluating the constitutionality of firearm regulations. *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2126-27. In *Bruen*, the Court held that the two-step approach used since *Heller* was "one step too many" and condemned any means-end analysis in the second amendment context. See *id*. at ___, ___, 142 S. Ct. at 2127, 2131 (noting that while "judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here [under the second amendment]"). Instead, the Court instructed that "plain text" and history alone would control. *Id.* at ___, 142 S. Ct. at 2129-30.

¶ 69    The Court explained that under the new framework, courts first needed to determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at ___, 142 S. Ct. at 2129-30. If it does, then the Constitution "presumptively protects that conduct" and the government "must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at ___, 142 S. Ct. at 2130. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." (Internal quotation marks omitted.). *Id.* at ___, 142 S. Ct. at 2130.

¶ 70    To carry this burden, the government must point to "historical precedent from before,

22

during, and even after the founding [that] evinces a comparable tradition of regulation." (Internal quotation marks omitted.) *Id.* at ___, 142 S. Ct. at 2131-32. Noting that "when it comes to interpreting the Constitution, not all history is created equal," the Court made clear that the relevant inquiry centers on what the founders understood the second amendment to mean. *Id.* at ___, 142 S. Ct. at 2136. In other words, the Court clarified that in looking to historical context, the most relevant time period is that of the amendment's enactment (in 1791). *Id.* at ___, 142 S. Ct. at 2136.[10]

¶ 71    In directing courts to canvass historical periods for context, the Court acknowledged that the task would not always be "straightforward," particularly when it involved "unprecedented societal concerns or dramatic technological changes." *Id.* at ___, 142 S. Ct. at 2131-32. Noting that in such circumstances "a more nuanced approach" was necessary, the Court instructed lower courts to seek out similar regulations and to reason by analogy. *Id.* at ___, 142 S. Ct. at 2132. As the Court explained, it is not necessary to identify a "historical twin"; rather a "well-established and representative [historical] *analogue* will do." (Emphasis in original.) *Id.* at ___, 142 S. Ct. at 2133.

¶ 72    The Court further clarified that "analogical reasoning" under the second amendment should not be "a regulatory straitjacket nor a regulatory blank check." *Id.* at ___, 142 S. Ct. at 2133. As such, "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.' " *Id.* at ___, 142 S. Ct. at 2133 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d

---

[10] In doing so, the Court acknowledged that the second amendment was enacted in 1791, but that the right to bear arms which that amendment guarantees was not extended to the states until the ratification of the fourteenth amendment in 1868. The court, however, refused to address the ongoing scholarly debate about which of these time periods was more relevant in determining the scope of the second amendment as it applied to state-enacted laws, finding that for purposes of the New York statute at issue in that case, the two reflected the same historical traditions. *Id.* at ___, ___, 142 S. Ct. at 2136, 2138.

Cir. 2021)). However, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at ___, 142 S. Ct. at 2133. The core question is whether the challenged regulation and the proffered analogue are "relevantly similar." *Id.* at ___, 142 S. Ct. at 2132.

¶ 73    The Court then clarified two metrics to be used in comparing the government's proffered analogues against the challenged law, namely: (1) how the challenged law burdens the right to bear arms; and (2) why the law burdens that right. *Id.* at ___, 142 S. Ct. at 2132 (citing *McDonald*, 561 U.S. at 767, and *Heller*, 554 U.S. at 599). In short, the Court explained that the proper inquiry turns on whether the "modern and historical regulations imposes a comparable burden on the right of armed self-defense, and *** whether that burden is comparably justified." *Id.* at ___, 142 S. Ct. at 2132.

¶ 74    After articulating this new standard for analyzing gun regulations under the second amendment, the Court in *Bruen* applied it to a New York law, which required a person seeking a license to carry a loaded pistol outside of the home to demonstrate "proper cause" and gave discretion to the licensing agency to determine what that meant. *Id.* at ___, 142 S. Ct. at 2122.

¶ 75    The Court first found that under the plain text of the second amendment the individual right to bear arms extended outside of the home. *Id.* at ___, ___, 142 S. Ct. at 2122, 2134-35. The Court therefore concluded that the regulated activity was "presumptively valid" and looked to whether the government could prove that the regulation aligned with well-established historical analogues at the time of the amendment's enactment and ratification. *Id.* at ___, 142 S. Ct. at 2122. The Court ultimately found that the New York law did not meet its exacting historic analysis. *Id.* at ___, 142 S. Ct. at 2138 (concluding that the government neither "demonstrate[d] a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" nor

identified "any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense"). It therefore concluded that the law violated both the second and fourteenth amendments. *Id.* at ___, 142 S. Ct. at 2138.

¶ 76    In the present case, on appeal, the defendant asserts that under the new test articulated in *Bruen*, the armed habitual criminal statute, under which he was convicted, is unconstitutional, as applied to him. He argues that possession of a firearm within one's home is the quintessential protected activity under the plain text of the second amendment. He further contends that because the armed habitual criminal statute was not enacted until 2005, and the first Illinois law to prohibit felons, including nonviolent felons, from permanently possessing firearms, was passed in 1984 (see Pub. Act 83-1056 (eff. July 1, 1984)), the State cannot demonstrate that the legislation is consistent with the nation's historical tradition of firearm regulation.

¶ 77    The State responds (1) that the defendant's conduct in carrying a weapon "in connection" with the sale of drugs is not encompassed by the plain text of the second amendment; (2) that, as a convicted felon, the defendant does not fall into the category of "people" protected under the plain text; and (3) that, regardless, the nation's historical tradition of firearm regulation demonstrates that persons, such as the defendant, are excludable as a class based on their dangerousness or "lack of virtue."

¶ 78    For the following reasons, we find that under the two-step framework articulated in *Bruen*, the defendant's as-applied challenge to the armed habitual criminal statute fails.

¶ 79    At the outset, we note that *Bruen* did not address the specific issue raised here by the defendant, namely whether felons, and in particular nonviolent felons, have a second amendment right to possess firearms.[11] However, since *Bruen*, courts of various jurisdictions have grappled

---

[11] In this respect, we reject the State's initial request to automatically disregard *Bruen* as inapplicable on the basis that in striking the New York law, the *Bruen* Court also implicitly endorsed

with this issue and in the vast majority of cases have found that, as applied to nonviolent felons, statutes prohibiting felons from possessing weapons are constitutional under *Bruen*. See, *e.g.*, *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) (holding that a federal statute prohibiting firearm possession by convicted felons was constitutional as applied to a defendant previously convicted of the sale of controlled substances and UPWF); *United States v. Rice*, No. 3:22-CR-36-JD, 2023 WL 2560836 (N.D. Ind. Mar. 17, 2023) (upholding the same federal statute as applied to a nonviolent felon previously convicted of distribution of narcotics and UPWF); *United States v. Price*, No. 21-CR-164, 2023 WL 1970251 (N.D. Ill. Feb. 13, 2023) (upholding the same federal statute as applied to a nonviolent felon convicted of numerous narcotics offenses); *United States v. King*, 634 F. Supp. 3d 76 (S.D.N.Y. 2022) (upholding the same federal statute as applied to a nonviolent felon previously convicted of possession of a controlled substance and UPWF); *United States v. Young*, 639 F. Supp. 3d  (W.D. Pa. 2022) (upholding the same federal statute as applied to a nonviolent felon previously convicted of numerous drug trafficking offenses); *United States v. Charles*, 633 F. Supp. 3d 874 (W.D. Tex. 2022) (upholding the same federal statute as applied to a defendant previously convicted of, *inter alia*, possession with intent to distribute narcotics); *United States v. Coombes*, 629 F.

---

Illinois licensing regulations for possessing and carrying firearms, which would in practice disallow a convicted felon, such as the defendant, from possessing a gun. See *Bruen*, 597 U.S. at ___, ___, ___, 142 S. Ct. at 2123 n.1, 2124, 2138 n.9) (noting that New York was part of a small minority of states that allowed licensing agencies *discretion* to deny concealed-carry license applications, such that they "may issue" a license, while the majority of states, including Illinois, are "shall issue" jurisdictions, where authorities have no discretion, and instead must issue a license whenever an applicant satisfies certain threshold requirements). While it is true that in invalidating the New York law, the *Bruen* Court indicated its approval of the "shall issue" jurisdictions and noted that "nothing" in its "analysis should be interpreted to suggest the unconstitutionality of the 43 State's 'shall-issue' licensing regimes," the Court neither examined the detail of any of these 43 "shall-issue" statutes, nor indicated that they were not challengeable under its new framework. *Id.* at ___, 142 S. Ct. at 2138 n.9. To the contrary, the Court stated, "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes." *Id.* at ___, 142 S. Ct. at 2138 n.9.

Supp.3 d 1149 (N.D. Okla. 2022) (upholding the same federal statute as to a defendant previously convicted of the nonviolent offenses of burglary and drug possession); see also *United States v. Farley*, No. 22-cr-30022, 2023 WL 1825066 (C.D. Ill. Feb. 8, 2023) (upholding a federal statute banning any person convicted of a misdemeanor crime from possessing a firearm as applied to a defendant with two prior convictions for domestic violence).

¶ 80    To our knowledge, post-*Bruen*, only two federal appellate courts have held that the second amendment protects a nonviolent offender's right to possess firearms. See *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (holding that the federal statute prohibiting convicted felons from possessing firearms was unconstitutional as applied to a defendant previously convicted of a felony-equivalent Pennsylvania conviction of making a false statement to obtain food stamp assistance); see also *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted by* ___ U.S. ___, 143 S. Ct. 2688 (2023) (holding that the federal statute prohibiting possession of firearms by convicted felons was unconstitutional, as applied to a defendant subject to a (civil) domestic violence restraining order).[12]

¶ 81    The analytical basis for upholding felon-possession statutes as applied to nonviolent felons has varied greatly. While some courts have treated convicted felons as lacking second amendment rights under the amendment's plain text (see, *e.g.*, *Price*, 2023 WL 1970251, at *4; *Young*, 639 F. Supp. 3d 515 at 523-24; *United States v. Riley*, 635 F. Supp. 3d 411, 424 (E.D.

---

[12] We note that some courts, including very recently the Seventh Circuit, have refused to address the issue without additional assistance either through amicus briefing or the appointment of expert historians. See *e.g.*, *Atkinson*, 70 F.4th 1018 (declined to address the issue because the briefs supplied by the parties insufficiently addressed the detailed historical inquiry required under *Bruen*'s second prong); *United States v. Bullock*, No. 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022) (emphasizing the problems that ensue when judge's must analyze conflicting historical interpretations, and requesting that the parties provide supplemental briefing on "whether it should appoint a historian to serve as a consulting expert [witness]"); *Baird v. Bonata*, No. 2:19-cv-00617-KJM-AC, 2022 WL 17542432 (E.D. Cal. Dec. 8, 2022) (same).

Va. 2022)), others have sustained the constitutionality of the regulations under *Bruen*'s second step, finding that the laws have historical underpinnings. See, *e.g.*, *Jackson*, 69 F.4th 495; *Rice*, 2023 WL 2560836; *Charles*,633 F. Supp. 3d 874; *United States v. Collette*, 630 F. Supp. 3d 841, 847-48 (W.D. Tex. 2022); *Coombes*, 629 F. Supp. 3d 1149; *United States v. Garrett*, No. 18-CR-880, 2023 WL 157961 (N.D. Ill. Jan. 11, 2023); *United States v. Gray*, No. 22-cr-00247-CNS, 2022 WL 16855696 (D. Colo. Nov. 10, 2022); *United States v. Bernard*, No. 22-CR-03 CJW-MAR, 2022 WL 17416681 (N.D. Iowa Dec. 5, 2022)).

¶ 82    The diverse bases offered by these different jurisdictions underscore the difficulties that the Supreme Court's new standard imposes on lower courts. See *Atkinson*, 70 F.4th at 1028 (Wood, J., dissenting) ("This approach poses enormous challenges to the district and circuit courts of this country, not to mention the myriad of state courts ***."); see also *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2179 (Breyer, J., dissenting) (there are inherent difficulties spawned by relying "nearly exclusively" on text and history to interpret the second amendment and these are "especially acute in the lower courts"); see also *United States v. Jackson*, No. ELH-22-141, 2023 WL 2499856 (D. Md. Mar. 13, 2023) ("the divergent conclusions" of the lower courts post-*Bruen* "give reason to suggest that a [text and] history-only test is not readily administrable").

¶ 83    That said, acknowledging the difficulty of the task before us, we turn to the merits of the defendant's claim.

¶ 84    The first step under *Bruen* asks us to determine whether the second amendment's plain language covers the defendant's conduct. *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2126. The State asserts that the defendant's conduct in possessing a firearm "in connection" with the sale or use of drugs is not protected under the plain text. The defendant responds that the relevant inquiry is his possession of the firearm, and not what he was doing "in connection" with that possession.

Moreover, he asserts that because the possession occurred inside his own home, his conduct is the cornerstone of the "individual right to keep and bear arms." See *Heller*, 554 U.S. at 595, 635. For the following reasons, we agree with the defendant.

¶ 85    The relevant portion of the second amendment provides that the right to "keep and bear arms" shall not be infringed. U.S. Const., amend II. The defendant here was convicted under the armed habitual criminal statute, which states in pertinent part that "[a] person commits the offense of being an armed habitual criminal" if he "*possesses* \*\*\* any firearm after being convicted of a total of 2 or more times of any combination" of the enumerated qualifying offenses, including, as applicable to the instant appeal, UPWF and "any violation of the Illinois Controlled Substances Act [(720 ILCS 570/100 (West 2016))] or the Cannabis Control Act [(720 ILCS 550/1 (West 2016))] that is punishable as a Class 3 felony or higher." (Emphasis added.) 720 ILCS 5/24-1.7 (West 2016).

¶ 86    Contrary to the State's position, the proscribed conduct under the statute was not the "carrying" of a firearm "in connection" with the use or sale of illegal drugs but rather the defendant's *possession* of the firearm after having been twice convicted under any of the myriad of enumerated felonies, which in this case, both happen to be nonviolent. Accordingly, answering whether the defendant's conduct falls under "keep and bear" is simple.

¶ 87    In *Heller*, the Supreme Court held that "to keep arms" means to "have weapons." *Heller*, 554 U.S. at 582. The plain meaning of "have" is "to be in possession of." Oxford English Dictionary (3d ed. 2015). Therefore, the second amendment's "keep and bear arms" language plainly encompasses possession, and the defendant's conduct is "presumptively protected" under *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2126. See *Heller*, 554 U.S. at 627 (possession of a firearm in one's home is the cornerstone of the second amendment right to "bear arms"); *Collette*, 630 F.

Supp. 3d at 844 (finding that "possession" of a firearm clearly falls under the conduct protected by the plain language of the second amendment); *Charles*, 633 F. Supp. 3d at 877 (same).

¶ 88     The State next contends that the plain text of the second amendment does not "encompass" the defendant because, as a convicted felon, *i.e.*, not a "law abiding citizen," he falls outside of the scope of "the people" that have the right "to keep and bear arms."

¶ 89     In making this argument, the State incorrectly conflates *Bruen*'s first step with its second. Under *Bruen*, the first step asks only whether "the Second Amendment's plain text covers an individual's *conduct*." (Emphasis added.) *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2126. This step does not contemplate the actor or the subject. [13] See *Collette*, 630 F. Supp. 3d at 844; *United States v. Banuelos*, 640 F. Supp. 3d 716, 722 (W.D. Tex. 2022); *Charles*, 633 F. Supp. 3d at 876; *United States v. Quiroz*, 629 F. Supp. 3d 511, 516 (W.D. Tex. Sept. 19, 2022); *United States v. Jackson*, 622 F. Supp. 3d 1063, 1066 (W.D. Okla. Aug. 19, 2022); *United States v. Kays*, 624 F. Supp. 3d 1262, 1265 (W.D. Okla. Aug. 29, 2022); *United States v. Nutter*, 624 F. Supp. 3d 636, 639 n.5 (S.D. W.Va. Aug. 29, 2022). Accordingly, the defendant's status as a felon is irrelevant at this stage of the analysis. Instead, the defendant's possession of a firearm is "presumptively constitutional." See *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2126. How the defendant's prior felony might impact his second amendment right to possess a firearm is more properly evaluated under

---

[13] We note that not all courts agree. Some have found that the plain text of the second amendment protects only the conduct of "law-abiding citizens." See, *e.g.*, *Price*, 2023 WL 1970251, at *3; *Young*, 639 F. Supp. 3d 515 at 523-24; *Riley*, 635 F. Supp. 3d at 424; *United States v. Perez-Garcia*, 628 F. Supp. 3d 1046, 1053 (S.D. Cal. 2022). Likewise, others have considered the status of the actor but found that the plain text of the second amendment protects conduct by felons since they are members of "the people." See, *e.g.*, *Coombes*, 629 F. Supp. 3d at 1155-56; *United States v. Carrero*, 635 F. Supp. 3d 1210, 1212 (D. Utah 2022); *Campiti v. Garland*, No. 3:22-cv-177 (AWT), 2023 WL 143173, at *3 (D. Conn. Jan. 10, 2023); *United States v. Rowson*, No. 22 Cr. 310 (PAE), 2023 WL 431037, at *18 (S.D.N.Y. Jan. 26, 2023). Still others, have declined to take a position. See, *e.g.*, *Rice*, 2023 WL 2560836, at *6-8; *United States v. Daniels*, 610 F. Supp. 3d 892, 893-95 (S.D. Miss. 2022).

the second step's historical tradition analysis. See *Collette*, 630 F. Supp. 3d at 844; *Banuelos*, 640 F. Supp. 3d at 722-23; *Charles*, 633 F. Supp. 3d at 876; *Quiroz*, 629 F. Supp. 3d at 516; *Jackson*, 622 F. Supp. 3d at 1066.

¶ 90    Therefore, turning to the second step, we evaluate whether the State has demonstrated that the armed habitual criminal statute is consistent with the nation's historical tradition of firearm regulation. For the following reasons, we find that it has.

¶ 91    "History shows that the right to keep and bear arms" has traditionally been "subject to restrictions that include[ ] prohibitions on possession by certain groups of people." *Jackson*, 69 F.4th at 502; see also *Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) ("[S]ince the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament ***."); see also *Range*, 69 F.4th at 128 (Krause, J., dissenting) (noting that legislatures have historically imposed " 'status-based restrictions' " disarming entire " 'categories' " of people).

¶ 92    The State is correct when it asserts that such categorical restrictions are inextricably linked to the notion of "law-abiding citizens."

¶ 93    Restrictions on the possession of firearms date back to England in the 1600s when the government repeatedly disarmed individuals whose conduct reflected that they could not be trusted to abide by "the sovereign and [his] dictates." *Range*, 69 F.4th at 120 (Krause, J., dissenting). The English Bill of Rights established that Parliament had the authority to determine which citizens could " 'have arms *** by Law.' " *Jackson*, 69 F.4th at 502 (quoting An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown 1689, 1 W. & M. Sess. 2, c. 2, § 7 (Eng.)); see *also Bruen*, 597 U.S. at ___, 142 S. Ct. at 2141-42. The Parliament first disarmed non-Anglican Protestants who refused to participate in the Church of

England and those who were " 'dangerous to the Peace of the Kingdom.' " *Jackson*, 69 F.4th at

502 (quoting Militia Act 1662, 13 & 14 Car. 2 c. 3, § 13 (Eng.)); see Joyce Lee Malcom, To

Keep and Bear Arms: The Origins of an Anglo-American Right 45 (1994). It later forbade

firearm ownership by Catholics who refused to renounce their faith. *Jackson*, 69 F.4th at 502

(citing An Act for the Better Securing the Government by Disarming Papists and Reputed

Papists 1688, 1 W. & M., Sess. 1, c. 15 (Eng.)).

¶ 94     In colonial America, legislatures continued to disarm individuals whose status indicated

that they could not be trusted to obey the law. As such, Native Americans, and other minority

groups, like Catholics in Maryland and Pennsylvania were banned from owning firearms. See

*Jackson*, 69 F.4th at 502-03 (citing Michael A. Bellesiles, *Gun Laws in Early America: The*

*Regulation of Firearms Ownership*, *1607-1794*, 16 Law & Hist. Rev. 567, 574, 578-79

(1998); Act of Aug. 4, 1675, in 5 Records of the Colony of New Plymouth, in New England 173

(Nathaniel B. Shurtleff & David Pulsifer eds., 1856); Act of July 1, 1656, in Laws and

Ordinances of New Netherland 234-35 (Edmund Bailey O'Callaghan ed., 1868); and Joseph G.S.

Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*,

20 Wyo. L. Rev. 249, 263 (2020)). Similarly, during the Revolutionary War, the Continental

Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey

prohibited possession of firearms by people who refused to swear loyalty oaths. *Id.* at 503 (citing

Journals of the Continental Congress 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906);

Act of Mar. 14, 1776, ch. 21, 1775-76 Mass. Acts 479; Act of May 1777, ch. III, in 9 The

Statutes at Large, Being a Collection of all the Laws of Virginia 281-82 (William W. Hening ed.,

1821); Act of June 13, 1777, ch. 756 §§ 2-4, 1777 Pa. Laws 110, 111-13; Act of June 1776, in

7 Records of the Colony of Rhode Island and Providence Plantations in New England 567 (John

Russel Bartlett ed., 1862); Act of Nov. 15, 1777, ch. 6, 1777 N.C. Sess. Laws 231; and Act of

Sept. 20, 1777, ch. XL, 1777 N.J. Laws 90); see also Joseph Blocher & Caitlan

Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, Duke L. Sch.

Pub. L. & Legal Theory Series No. 2020-80, at 5 & nn. 38-41(2020).

¶ 95    Prior to the adoption of the Bill of Rights in 1791, during the ratification process, the

"highly influential minority proposal" (*Heller* 554 U.S. at 604 (citing 2 Bernard Schwartz, The

Bill of Rights: A Documentary History 664 (1971))), published by the Anti-Federalist delegates

in Pennsylvania, suggested that the people should have a right to bear arms " 'unless for crimes

committed, or real danger of public injury from individuals.' " *Id.* at 658 (Stevens, J., dissenting,

joined by Souter, Ginsburg, and Breyer, JJ.)(quoting Schwartz, *supra*, at 665). While this

amendment was not adopted, it is important because it reflects the understanding of the founders

that "crimes committed," whether dangerous or not, justified disarmament. *Range*, 69 F.4th at

126 (Krause, J., dissenting).

¶ 96    Founding-era criminal punishments also demonstrate the widespread acceptance of the

legislatures' authority to disarm felons. *Id.* In the Colonial period, legislatures prescribed death

or forfeiture of a person's entire estate (presumably including firearms) as punishment for

numerous nonviolent crimes (including deceit, forgery, and wrongful taking of property). *Id.* at

126-27; see also *Rice*, 2023 WL 2560836, at *9; *Jackson*, 69 F.4th at 503 (citing An Act for the

Punishment of Certain Crimes Against the United States, Pub. L. No. 1-9, § 14, 1 Stat. 112, 115

(1790); Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664-65; Act of May 1777, ch. XI, in 9 The

Statutes at Large, Being a Collection of all the Laws of Virginia 302-03 (William W. Hening ed.,

1821); A Digest of the Laws of Maryland 255-56 (Thomas Herty ed., 1799); Stuart Banner, The

Death Penalty: An American History 3, 18, 23 (2002); John D. Bessler, Cruel & Unusual: The

American Death Penalty and the Founders' Eighth Amendment 56-57 (2012); and Kathryn

Preyer, *Penal Measures in the American Colonies: An Overview*, 26 Am. J. Legal Hist. 326, 330-

32, 342, 344-47 (1982)). Even some non-capital offenses triggered the permanent loss of an

offender's estate, including any firearms. For example, a 1786 New York statute punished those

who counterfeited state bills of credit with life imprisonment and the forfeiture of their entire

estate. *Range*, 69 F.4th at 127 (Krause, J., dissenting) (citing Act of Apr. 18, 1786, in 2 Laws of

the State of New York 253, 260-61 (1886)). Similarly, minor nonviolent infractions, such as

hunting in prohibited areas, were punished with seizure of the firearms involved in the offenses.

*Jackson*, 69 F.4th at 503 (citing Laws and Ordinances of New Netherland 138 (Edmund Bailey

O'Callaghan ed., 1868), and Act of Apr. 20, 1745, ch. III, in 23 State Records of North

Carolina 218-19 (Walter Clark ed., 1904)).

¶ 97     As this survey reflects, there is a historical tradition of legislatures exercising their

discretion to impose "status-based restrictions" disarming entire "categories of persons" who,

based on their past conduct, were presumed unwilling to obey the law. *Range*, 69 F.4th at 129

(Krause, J., dissenting).[14] "Legislatures did so not because the individuals in these groups were

considered dangerous [or violent], but because, based on their status, they were deemed non-law-

abiding subjects." *Id.*; see also *Jackson*, 69 F.4th at 503. While the particular groups varied over

---

[14] It goes without saying that many of these categorical prohibitions would be impermissible

today under other constitutional provisions. Nonetheless, they are relevant in determining the historical

understanding of the right to keep and bear arms.

time, the founders understood that felons were one such group. *Range*, 69 F.4th at 129.

¶ 98     The majority of legal historians agree with this position,[15] noting that in "classical republican political philosophy" the right to bear arms was "inextricably and multifariously tied to" the concept of a "virtuous citizenry." (Internal quotation marks omitted.) *Coombes*, 629 F. Supp. 3d at 1157 (citing Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995), and Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002)). In other words:

> "[T]he right to bear arms in the Founding era [was] a civic right. Such a right was not something that all persons could claim but was limited to those members of the polity who were deemed capable of exercising it in a *virtuous manner*." (Emphasis added.) Cornell, *supra* at 679.

As such "[f]elons simply did not fall within the benefit of the common law right to possess arms," which turned on one's law-abiding character. Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983); see also *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (suggesting that the second amendment right was limited to "virtuous" persons); see also Thomas M. Cooley, A Treatise on

---

[15] But see Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wy. L. Rev. 249, 262, 264-65 (2020) (arguing that in Colonial America disarmament laws applied only to those individuals "perceived as dangerous"); see also C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 697, 708 (2009)) (arguing that history shows that firearm restrictions should apply only to those convicted of a "crime of violence").

Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 29 (1st ed. 1868) (noting that certain classes of people were "almost universally excluded" from exercising certain civic rights, including "the idiot, the lunatic, and the felon on obvious grounds").

¶ 99     This conclusion is further bolstered by Supreme Court precedent. In *Heller*, the Court held that the second amendment "elevates above all other interests the right of *law-abiding, responsible citizens* to use arms in defense of hearth and home." (Emphasis added.) *Heller*, 554 U.S. at 635. The Court contrasted this category of citizens with "felons and the mentally ill" whom the government may prohibit from possessing firearms. *Id.* at 626, 627 n.26. Subsequently, in *Bruen*, the Supreme Court characterized the holders of second amendment rights as "law-abiding citizens" no fewer than fourteen times. See *Bruen*, 597 U.S. ___, ___, ___, ___, ___, ___, ___, ___, 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138, 2150, 2156. These included its instruction to identify historical analogues to modern firearm regulations by assessing how and why the regulations burden a "law-abiding citizen's" right to armed self-defense. *Id.* at ___, ___, 142 S. Ct. at 2118, 2125. In addition, the *Bruen* Court indicated that it would not disfavor a licensing regime that required applicants to undergo criminal background checks that are "designed to ensure" that "those bearing arms in the jurisdiction are, in fact *law-abiding, responsible citizens*." (Emphasis added and internal quotation marks omitted.) *Id.* at ___, 142 S. Ct. at 2138 n.9.

¶ 100   For these reasons, we conclude that both the founding-era historical record and Supreme Court precedent support the ability of our legislature to prohibit firearm possession by people who have "demonstrated disrespect for legal norms of society." *Jackson*, 69 F.4th at 504. Since the defendant in the instant case was twice convicted of a felony, albeit nonviolent ones, he is not

a law-abiding citizen, and the armed habitual criminal statute that prohibits his possession of firearms is constitutional as applied to him.

¶ 101   Even if we were to indulge the defendant and take the view adopted by the minority of historians that traditionally regulation of firearms possession was an effort to address a risk of dangerousness (see Greenlee, *supra* at 262, 264-65; C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun*? 32 Harv. J.L. & Pub. Pol'y  695, 697, 708 (2009)), such that it would not apply to the defendant as a nonviolent felon, we would nonetheless find that the prohibition on firearm possession by convicted felons passes muster under historical analysis. See *Jackson* 69 F.4th at 504.

¶ 102   "History demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.*; see also *Atkinson*, 70 F.4th at 1033 (Wood, J., dissenting). For example, not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, and not all early Americans who declined to swear loyalty oaths were violent or dangerous persons. *Jackson*, 69 F.4th at 504. "Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of *danger* if armed." (Emphasis added.) *Id.* In reasoning by analogy from that history, as *Bruen* instructs us to do, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." See *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2132 (noting that when addressing an "unprecedented societal concern[ ]" the historical inquiry will not be straightforward and courts may look to a historical analogue that is "relatively similar" to the modern regulation).

¶ 103   Our legislature enacted an analogous prohibition in the armed habitual criminal statute to address modern conditions, specifically "the threat of violence that arises when repeat offenders

possess firearms." *People v. Johnson*, 2015 IL App (1st) 133663, ¶ 27. As the defendant himself

points out, the first Illinois criminal statute prohibiting convicted felons from temporarily

possessing firearms was passed in 1967. See 1967 Ill. Laws 2605 (§ 1); Ill. Rev. Stat. 1967, ch.

38, ¶ 24-3.1. Subsequently, as the defendant points out, in response to the federal war on drugs,

Illinois enacted numerous laws criminalizing nonviolent drug offenses. See also Pub. Act 77-757

(eff. Aug. 16, 1971) (adding Ill. Rev. Stat. 1973, ch. 56½, ¶ 401 (for the first time making it a

felony to manufacture or deliver controlled substances)); see also *Gonzales v. Raich*, 545 U.S. 1,

10 (2005) (noting that after President Nixon declared a "war on drugs" in 1969, Congress passed

the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 801 *et seq.*

(1970)); see also Jacob D. Charles & Brandon L. Garrett, *The Trajectory of Federal Gun Crimes*,

170 U. Pa. L. Rev. 637, 674 (2022) (describing the rise of federal gun prosecutions during the

war on drugs and war on crime era). As a result, in 1984, the legislature also enacted the

precursor to the modern-day armed habitual criminal statute, making it a felony to "knowingly

possess on or about [one's] person or on [one's] land or in [one's] own abode or fixed place of

business any *** firearm *** if the person has been convicted of a felony under the laws" of

Illinois or "any other jurisdiction." Pub. Act 83-1056 (eff. July 1, 1984). That felony was

elevated to Class X status, in 2005, in the current version of the armed habitual criminal statute,

which criminalizes the knowing possession of a firearm by persons convicted of two or more

enumerated felonies, including nonviolent drug offenses. Pub. Act 94-398 (eff. Aug. 2, 2005)

(adding 720 ILCS 5/24-1.7).

¶ 104    This "modern expansion" of Illinois's criminal law was "a response to modern, urban,

and technological challenges unheard of and not contemplated in the Founding era." *Banuelos*,

640 F. Supp. 3d at 724; see also *Charles*, 633 F. Supp. 3d at 883. Accordingly, while the

defendant correctly points out that Illinois did not have a statute criminalizing the possession of firearms by convicted felons until about 200 years after the enactment of the second amendment, this does not preclude a finding that the regulation has historical traditions. Requiring this court to find a " 'historical twin' " or "hew so closely to [the founding era's] concept of felonious behavior" would turn the historical analysis into the " 'regulatory straitjacket' " shunned by *Bruen*. *Banuelos*, 640 F. Supp. 3d at 723-24 (citing *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2133).

¶ 105   In sum, we conclude that the legislature's ability to impose status-based restrictions disqualifying certain categories of people from possessing firearms is consistent with the national historical tradition of firearm regulation. See *Jackson*, 69 F.4th at 505. Regardless of how we characterize such restrictions, *i.e.*, as "restrictions on persons who deviate[ ] from legal norms or persons who presented an unacceptable risk of dangerousness" our legislature acted within the historical tradition when it enacted the armed habitual criminal statute criminalizing the possession of firearms by twice-convicted felons. *Id.* Consistent with the Supreme Court's repeated assurances that no doubt should be cast on the constitutionality of laws prohibiting the possession of firearms by felons, we conclude that the armed habitual criminal statute is constitutional as applied to the defendant. See *Heller*, 554 U.S. at 626, 627 n.26 (noting that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" and characterizing such laws as "presumptively lawful"); *McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill ***.' [Citation.] We repeat those assurances here."); *Bruen*, 597 U.S. at ___, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (expressly reaffirming the language in *Heller* regarding the longstanding prohibition on possession of firearms by felons); *Id.* at ___, 142 S. Ct.

at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or

*McDonald* \*\*\* about restrictions that may be imposed on the possession of carrying of guns.").

¶ 106                                        III. CONCLUSION

¶ 107    For the aforementioned reason, we affirm the judgment of the circuit court.

¶ 108    Affirmed.

---

## *People v. Brooks*, 2023 IL App (1st) 200435

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-118301; the Hon. Stanley J. Sacks, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Rebecca I. Levy, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, David Iskowich, and Susanna Bucaro, Assistant State's Attorneys, of counsel), for the People. |

---