2024 IL App (1st) 221230-U

No. 1-22-1230

October 29, 2024

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 1006 |
| | ) | |
| JAMES BENSON, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

ORDER

¶ 1   *Held*:   The trial court judgment is affirmed where (1) the evidence was sufficient to convict defendant of reckless discharge of a firearm, and (2) the unlawful use or possession of a weapon by a felon statute is not unconstitutional on its face or as applied to defendant. We reduce defendant's improper sentence for misdemeanor domestic battery and order correction of his mittimus.

¶ 2   Following a bench trial, defendant James Benson was found guilty of reckless discharge of a firearm (720 ILCS 5/24-1.5(a) (West 2020)), unlawful use or possession of a firearm by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2020)), and misdemeanor domestic battery (720 ILCS 5/12-

3.2(a)(2) (West 2020)). He was sentenced to concurrent terms of three, four, and three years' imprisonment, respectively. On appeal, defendant argues that (1) the evidence was insufficient to prove him guilty of reckless discharge of a firearm; (2) the court sentenced him above the maximum term for misdemeanor domestic battery; and (3) his UUWF conviction is unconstitutional both facially and as applied to him under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). We affirm defendant's convictions, reduce his sentence for domestic battery, and order correction of his mittimus.

¶ 3    Defendant was charged by indictment with one count each of aggravated discharge of a firearm, UUWF, and domestic battery arising from an incident on December 24, 2021.

¶ 4    At trial, Alisha Bradley testified that in December 2021, she lived in an apartment in Chicago with defendant, whom she dated. Late on December 23, 2021, into early December 24, Bradley was in the apartment with a friend, Valencia Johnson. Bradley and Johnson were drinking shots of liquor until defendant arrived at 11 to 11:30 p.m. Defendant was intoxicated, so Bradley put him in bed. Afterward, Bradley and Johnson drove to purchase food.

¶ 5    When they returned, Johnson was "very intoxicated" and wanted to "sober up." She asked Bradley for towels so that she could bathe. While searching for towels, Bradley reviewed defendant's phone and saw text messages that he sent other women. Bradley became "really, really upset" and retrieved a firearm from a lockbox in their bedroom closet. Bradley "cock[ed]" the firearm, causing bullets to fall onto the floor. She punched defendant to wake him and yelled at him. Then, she set down the firearm and defendant hid it from her. Defendant never used the firearm against her. Bradley confronted defendant about the messages, which he claimed were "old." She argued with defendant for a few minutes, then threw cups at his computer. Defendant

broke a chair in the living room and Johnson left the apartment. The police arrived "not too long" later.

¶ 6    Bradley, while crying, informed the police that defendant had a firearm. The officers arrested defendant, and Bradley told them that defendant was "really intoxicated," she and defendant fought, and he hit her with a chair. She also told them that defendant was "very hostile" when she and Johnson returned from the restaurant, and removed a firearm from its holster and cocked it. She stated to the officers that Johnson ran downstairs, and defendant kicked Bradley as she attempted to FaceTime her mother, "got mad," and broke her phone. She informed the officers that defendant asked, "Are you ready to die, b***?" Then, defendant hit her with a chair, breaking it. She also told the officers that as she told defendant to "calm down," he shot at her, and then hid the firearm under the mattress or bed; afterwards, Bradley gave the officers permission to search the apartment.

¶ 7    On cross-examination, Bradley stated that she and Johnson were intoxicated during the events. Bradley showed officers a hole in the floor and informed them it was where defendant discharged the firearm. She testified that it was not a bullet hole.

¶ 8    Johnson testified that late on December 23 and early on December 24, 2021, she was at Bradley and defendant's apartment. Defendant returned home and lay down in the bedroom, and Johnson and Bradley left to get food. Later, Johnson and Bradley sat at the dining room table to eat. Bradley and defendant argued for 10 to 15 minutes. Johnson left the apartment before the fight became physical and did not see Bradley or defendant with a firearm. Johnson went to her vehicle and called the police "because of the arguing."

¶ 9    Johnson acknowledged that, when officers arrived, she told them that Bradley woke defendant, who began to slap Bradley, and he retrieved a firearm from the bedroom, which he placed on the table. Johnson informed officers that during the argument, defendant picked up the firearm and "started shooting" in Bradley's direction. Johnson told the officers that she heard the first gunshot and walked away. In court, Johnson described the firearm as a "[s]mall cop gun," meaning a "regular" firearm without "[t]he little barrel with twirls."

¶ 10    On cross-examination, Johnson agreed that she was "very intoxicated" during the incident. When officers arrived, she was lying on the sidewalk. Later, she experienced "dry heaving or vomiting." Johnson did not know whether defendant and Bradley had relationships with other people.

¶ 11    Chicago police officer Thomas Kowal testified that he responded to the scene, an apartment building with store fronts on the main level. Kowal spoke with Johnson, who was lying on the ground. He believed she was having a panic attack, and that she "had something to drink" but was not intoxicated. Afterward, Kowal walked to the second-floor apartment. There, he saw Bradley, who was frantic and crying but did not appear to be intoxicated. Kowal arrested defendant, placed him in a police vehicle, and returned to the apartment. Bradley reported that defendant struck her, threatened her with a firearm, said he would kill her, and shot at her. Bradley directed Kowal to the bedroom to search for the firearm, and to the dining room, which had a hole in the floor near the window, and to an expended shell casing. Kowal believed the hole was from a bullet. Kowal recovered a loaded semiautomatic firearm from underneath the mattress in the bedroom.

¶ 12    Kowal testified that he activated his body-worn camera while conversing with Bradley and Johnson and searching the apartment, and identified the footage in court. Portions were published without audio, but the following events were narrated by Kowal.

¶ 13    In the video, Bradley leads officers to the windows in the corner of the dining room. Kowal testified that Bradley led them to the hole, but it is not visible in the footage. In another clip, the officers discover a black firearm underneath the mattress in the bedroom.

¶ 14    Chicago police detective Douglas Livingstone testified that he attempted to speak with Bradley after the incident but was unable to contact her. Johnson gave Livingstone her statement, and Livingstone spoke with defendant after he was arrested. After the officers Mirandized defendant, he informed Livingstone that he "possessed" the recovered firearm for two or three weeks prior to the incident.

¶ 15    Chicago police officer Melinda Guillen testified that she responded to the scene with Kowal. Guillen identified footage from her body camera, segments of which were published with audio.

¶ 16    The published footage shows, in relevant part, Guillen's conversation with Johnson outside the apartment. Johnson tells Guillen that defendant was "slapping [Bradley] around," retrieved his firearm from the room, placed it on the table, and then picked it up and shot it in Bradley's direction. Johnson then left.

¶ 17    The State entered into evidence a certified copy of defendant's 2015 conviction for aggravated unlawful use of a weapon (AUUW) premised upon the lack of a Firearm Owners

Identification (FOID) card.[1]

¶ 18    The defense called Thomas Stamps, who testified that he owned a .40-caliber firearm. Stamps had a FOID card, which he obtained on November 2, 2020. Stamps identified his FOID card and receipt for the firearm. Stamps "received" the firearm on April 12, 2020.

¶ 19    In late December 2021, Stamps lived with defendant and Bradley. When Stamps was at work, he kept his firearm in its box on the top shelf of defendant and Bradley's closet. Stamps worked the evening of December 23, 2021. On cross-examination, Stamps stated that he did not know who handled his firearm on December 23, 2021.

¶ 20    Defendant testified that he was convicted of AUUW in 2015 and attempt to unlawfully possess a weapon in 2018. Defendant had been dating Bradley for approximately 1½ years at the time of trial and lived with her in the apartment. Defendant described his relationship with Bradley as "exclusive," but Johnson was "part" of the relationship as she was Bradley's girlfriend.

¶ 21    On December 23, 2021, defendant was out drinking with his friend and became intoxicated. Defendant returned home where he saw Bradley and Johnson in the dining room drinking. Bradley helped defendant into bed and he slept for "a little while," before waking to Bradley hitting him and telling him about seeing a message on his phone. The message was from 2016, but Bradley continued to yell, so they moved into the dining room. Defendant did not want to fight and told her that he could pack her a bag and she could leave with Johnson.

¶ 22    At that point, Bradley said, "this mother*** think I'm playing with him," and cocked a firearm, with a round hitting the floor. Defendant asked Bradley if she would shoot him. He took

---

[1] The certified copy of conviction notes that defendant entered two guilty pleas for the case on April 6, 2015, and September 4, 2018.

the firearm from Bradley and hid it under the bed. The firearm belonged to Stamps, defendant's friend whom he considered a brother. Defendant had discharged the firearm at the "gun range" and kept the shell casings.

¶ 23 The police arrived and defendant cooperated when they arrested him, although he argued and tried to explain what happened because they did not ask him questions.

¶ 24 On cross-examination, defendant stated that he told the officers that the firearm was not fired that evening and that he did not have a firearm. Defendant told the officers that Bradley was trying to kill him, but he understood that Bradley was just trying to get his attention by cocking the firearm. Bradley never pointed the firearm at him. Defendant told a detective that he possessed the firearm for two to three weeks after the detective did not "listen" when he said that the firearm was not his or Bradley's. Defendant did not own the firearm.

¶ 25 On redirect examination, defendant testified that he told officers multiple times that he took the firearm from Bradley but they did not listen to him.

¶ 26 The court found defendant guilty of the lesser included offense of reckless discharge of a firearm, UUWF, and misdemeanor domestic battery. In ruling, the court commented that Bradley and Johnson told police the same story regarding defendant's actions and asked the officers for assistance. The court acknowledged that events Bradley and Johnson described at trial were "much different," but noted that "[i]t happens frequently" in domestic battery cases. The body camera footage showed that Bradley and Johnson were anxious when speaking with the officers, and Bradley showed them the bullet hole and told them the location of the firearm. The court believed that the original story that Bradley and Johnson told to police was "accurate" and "fresh" and, thus, the court believed the events occurred.

¶ 27     Regarding the aggravated discharge of a firearm count, the court noted that the firearm was likely pointed at Bradley "at one point" and discharged into the ground, which was "certainly scary enough." Thus, the State proved the lesser included offense of reckless discharge of a firearm. The court also commented that defendant possessed the firearm but did not own it.

¶ 28     The court denied defendant's motion for a new trial, finding "no question" that Bradley and Johnson lied on the witness stand, which "happens frequently." It found their prior statements "compelling" and "believable beyond a reasonable doubt."

¶ 29     Defendant's presentence investigative report (PSI) listed four prior convictions from 2000 through 2018, comprising AUUW premised on the lack of a FOID card, a violation of bail bond, driving on a suspended license, and retail theft. After a hearing, the court sentenced defendant to four years' imprisonment for UUWF, concurrent to terms of three years' imprisonment for the reckless discharge and misdemeanor domestic battery offenses. The court denied defendant's motion to reconsider sentence.

¶ 30     On appeal, defendant argues that the evidence was insufficient to prove him guilty of reckless discharge of a firearm because the State did not establish that he endangered the bodily safety of another person. Defendant contends that Bradley's testimony and the location of the bullet hole in the floor of the apartment belies the contention that she was endangered.

¶ 31     The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Belknap*, 2014 IL 117094, ¶ 67. The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic facts to ultimate facts.

*People v. Brown*, 2013 IL 114196, ¶ 48. Accordingly, this court will not retry the defendant or substitute its judgment for that of the trier of fact on the weight of the evidence or credibility of witnesses. *Id*. A reviewing court must allow all reasonable inferences from the record in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and will not reverse a conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt" (*People v. Jackson*, 232 Ill. 2d 246, 281 (2009) (internal quotation marks omitted)).

¶ 32    As noted, defendant was charged with aggravated discharge of a firearm and found guilty of the lesser included offense of reckless discharge. To prove reckless discharge of a firearm, the State had to prove beyond a reasonable doubt that defendant discharged a firearm in a reckless manner, which endangered "the bodily safety of an individual." 720 ILCS 5/24-1.5(a) (West 2020).

¶ 33    Defendant does not dispute that he discharged a firearm or acted recklessly. He only challenges the sufficiency of the evidence establishing that he endangered the bodily safety of another person. To endanger a person means that a defendant's conduct "created a dangerous situation—such that an individual was in peril of probable harm or loss." *People v. Collins*, 214 Ill. 2d 206, 215 (2005). Endangerment in this context does not require the discharge of a firearm in the direction of another person. *Id*. at 215-16. Rather, it is sufficient that the defendant discharge the firearm "in such a way as to place a person in danger." *People v. Kasp*, 352 Ill. App. 3d 180, 188 (2004).

¶ 34    Here, the evidence is sufficient to establish that defendant endangered the bodily safety of Bradley. Bradley told the responding police officers that she and defendant argued. Defendant said, "[a]re you ready to die, b***?" and hit her with a chair. Then, he fired in Bradley's direction.

Bradley showed the officers a bullet hole in the floor of the dining room and directed them to the bedroom where defendant hid the firearm underneath the mattress. Bradley and Johnson gave the officers consistent statements, although they both recanted their statements at trial. The State also presented body camera footage from both Kowal and Guillen which included Johnson's statement to Guillen and Bradley showing the officers the bullet hole. Given this record, we cannot say that the evidence was insufficient to establish endangerment.

¶ 35    Defendant nevertheless contends the evidence was insufficient because Bradley's and Johnson's testimonies varied significantly from their statements to officers. Further, both admitted at trial that they had been drinking alcohol that evening, with Johnson intoxicated to the point of lying on the sidewalk outside. Defendant also argues that the location of the bullet hole in the floor is "not consistent with an attempt by [defendant] to endanger Bradley." Defendant additionally contends that no physical evidence established that the hole was from a bullet, and the apartment was above a business with no evidence presented that the business was occupied at the time of the incident.

¶ 36    We reject defendant's interpretation of the evidence. First, the trial judge concluded that those statements were accurate and "fresh," and noted that "frequently" complaining witnesses change their testimonies in domestic battery cases. Given the evidence regarding the initial statements, including Bradley showing officers the bullet hole and general location of the firearm, we will not substitute our judgment for that of the trial court regarding the weight of the evidence or Bradley's and Johnson's credibility. See *Brown*, 2013 IL 114196, ¶ 48.

¶ 37    Additionally, both Bradley and Johnson testified that defendant discharged the firearm in Bradley's direction inside the dining room. The location of the bullet hole suggests that the firearm

was pointed down rather than aimed at Bradley; however, this evidence is sufficient to establish that defendant placed Bradley in danger. See *Kasp*, 352 Ill. App at 188. As noted, endangerment does not require the discharge of a firearm in the direction of another person. See *Collins*, 214 Ill. 2d at 215-16. Accordingly, any rational trier of fact could have found that this evidence established that defendant endangered Bradley's bodily safety. See *Belknap*, 2014 IL 117094, ¶ 67. Consequently, the evidence was sufficient to establish that defendant committed reckless discharge of a firearm.

¶ 38 Defendant further contends, and the State concedes, that the court erred in imposing a three-year prison term for defendant's misdemeanor domestic battery conviction, which carries a maximum sentence of 364 days' imprisonment.

¶ 39 Defendant recognizes that he did not raise his sentencing challenge before the trial court, forfeiting the claim. See *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010). However, defendant seeks review under the plain error doctrine, which allows a reviewing court to consider an unpreserved claim where a clear and obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) the error is so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48. Sentencing errors can be reviewed under the second prong of plain error review where, as here, a defendant's substantial rights are affected. See *People v. Myrieckes*, 315 Ill. App. 3d 478, 483 (2000).

¶ 40 Defendant was convicted of misdemeanor domestic battery, which carries a maximum sentence of "less than one year." See 720 ILCS 5/12-3.2(a)(2), (b) (West 2020); 730 ILCS 5/5-4.5-55(a) (West 2020). Thus, we agree with the parties that defendant's three-year sentence for

domestic battery is erroneous, reduce the sentence to 364 days, and order defendant's mittimus be corrected. See Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967).[2] All other convictions and sentences will remain as imposed by the trial court. We further direct the clerk of the circuit court to correct the mittimus to reflect the reduced sentence. See *People v. Kline*, 2024 IL App (1st) 221595, ¶ 91.

¶ 41    Lastly, defendant argues that the UUWF statute is unconstitutional on its face under the second amendment to the United States Constitution because it does not comply with the framework established by the United States Supreme Court in *Bruen*. He also argues that the UUWF statute is unconstitutional as applied to him as his prior conviction for UUWF without a FOID card is not an inherently dangerous offense justifying a permanent ban on firearms possession.

¶ 42    Here, defendant was convicted of UUWF under section 24-1.1(a) of the Criminal Code of 2012, which provides that "[i]t is unlawful for a person to knowingly possess on or about his person *** any firearm *** if the person has been convicted of a felony." 720 ILCS 5/24-1.1(a) (West 2020). Relevant here, defendant was convicted of UUWF premised upon the lack of a FOID card.

¶ 43    The constitutionality of a statute is a matter of law, which we review *de novo*. *People v. Ligon*, 2016 IL 118023, ¶ 11. In analyzing a challenge to the constitutionality of a statute, "we begin with the presumption that the statute is constitutional and that, if reasonably possible, this court must construe the statute so as to affirm its constitutionality and validity." *Id.*

¶ 44    A party raising a facial challenge to the constitutionality of a statute "faces a particularly heavy burden," because "[a] statute will be deemed facially unconstitutional only if there is no set

_____

[2] The website of the Illinois Department of Corrections, which is subject to judicial notice (*People v. Johnson*, 2021 IL 125738, ¶ 54), states defendant's parole date as November 6, 2023.

of circumstances under which the statute would be valid." *People v. Bochenek*, 2021 IL 125889, ¶ 10. Therefore, a facial challenge fails if any situation exists where the statute could be validly applied. *People v. Davis*, 2014 IL 115595, ¶ 25. In contrast, an as-applied challenge "requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party." *People v. Thompson*, 2015 IL 118151, ¶ 36.

¶ 45    The second amendment provides: "A well regulated Milita, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In 2008, the United States Supreme Court issued its decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), holding that the second amendment elevated "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. The second amendment applies to the States through the fourteenth amendment of the United States Constitution. *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010).

¶ 46    Under *Heller* and *McDonald*, courts developed a two-step test to assess second amendment challenges to firearm regulations. See *People v. Smith*, 2024 IL App (1st) 221455, ¶ 11. First, the government could justify the regulation by establishing that the regulated activity fell outside the scope of the second amendment as it was originally understood. *Id*. If the conduct fell beyond the second amendment's original scope, it was "categorically unprotected." *Id*. Otherwise, the court would progress to the second step and conduct a "means-end analysis" where the court weighed the severity of the regulation against the ends the government sought to achieve. *Id*.

¶ 47    In *Bruen*, the United States Supreme Court announced a new analytical framework for evaluating the constitutionality of firearm regulations under the second amendment. *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 68 (citing *Bruen*, 597 U.S. at 17). Under *Bruen*, a court must

first determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24; *Brooks*, 2023 IL App (1st) 200435, ¶ 69. If it does, then the Constitution "presumptively protects that conduct" and the government must justify the regulation by showing that it is consistent with the nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 24; *Brooks*, 2023 IL App (1st) 200435, ¶ 69. To make this showing, the government must point to historical precedent which establishes what the founders understood the second amendment to mean. *Bruen*, 597 U.S. at 24-25; *Brooks*, 2023 IL App (1st) 200435 ¶ 70.

¶ 48    Regarding defendant's facial challenge, he has not established that the UUWF statute could not be validly applied to any defendant. This court has interpreted *Bruen* in the context of UUWF and has determined that *Bruen* does not apply to felons, because the holding was limited to laws affecting "law-abiding citizens." See *People v. Baker*, 2023 IL App (1st) 220328, ¶ 37 (rejecting the defendant's as-applied constitutional challenge to the UUWF statute); see also *People v. Mobley*, 2023 IL App (1st) 221264. As the UUWF statute could be validly applied to the defendants in *Baker* and *Mobley*, defendant's facial challenge to the statute must also fail. See *Bochenek*, 2021 IL 125889, ¶ 10; *People v. Burns*, 2024 IL App (4th) 230428, ¶¶ 18-22 (rejecting the defendant's facial challenge to the UUWF statute using the reasoning in *Baker*).

¶ 49    Defendant requests we depart from our holding in *Baker*, and instead follow the reasoning in *Brooks*, 2023 IL App (1st) 200435, ¶ 89, where we found that a defendant's status as a felon is irrelevant under the first step of the *Bruen* analysis and "is more properly evaluated under the second step's historical tradition analysis." Under *Brooks*, the first step of the *Bruen* analysis addresses an individual's conduct, and "does not contemplate the actor or the subject" and, thus, a defendant's possession of a firearm is "presumptively constitutional." See *Brooks*, 2023 IL App

(1st) 200435, ¶ 89. However, even if we did follow *Brooks*, sufficient historical precedent exists to ban felons from possessing firearms under the second step of the *Bruen* analysis. See *id*. ¶¶ 100-105 ("[T]he legislature's ability to impose status-based restrictions disqualifying certain categories of people from possessing firearms is consistent with the historical tradition of firearm regulation."); *People v. Travis*, 2024 IL App (3d) 230113, ¶¶ 27-33 (finding that the UUWF statute was "consistent with this nation's history of preventing potentially dangerous individuals from exercising the right to bear arms," and so was facially constitutional).

¶ 50    Regarding defendant's as-applied challenge, the State argues that defendant forfeited the issue because he raises it for the first time on direct appeal. See *People v. Holman*, 2017 IL 120655, ¶ 32 *overruled on other grounds by People v. Wilson*, 2023 IL 127666 ("[A] defendant must present an as-applied constitutional challenge to the trial court in order to create a sufficiently developed record.").

¶ 51    Normally, "as-applied constitutional challenges are dependent on the specific facts and circumstances of the challenging party and, therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." (Internal quotation marks omitted.) *People v. House*, 2021 IL 125124, ¶ 27. Here, defendant premises his as-applied challenge on the contention that the founders permitted disarmament only for persons who were presently dangerous, not for persons who were mere felons. He argues his conviction for UUWF was predicated upon a conviction for possession of a firearm without a FOID card, which is not "inherently dangerous" to justify a permanent ban on firearm possession. Defendant also argues that his as-applied challenge is "legal in nature," and so the trial record is sufficient to review the issue. See *People v. Gross*, 2024 IL App (2d) 230017-U, ¶ 18 (the question of whether

it is constitutionally permissible to restrict a person from possessing a firearm if previously convicted of a felony which does not have a violent act as an element is legal in nature).[3] We agree with defendant and, accordingly, reach the merits of the issue.

¶ 52    Here, the facts and circumstances of defendant's case do not support his contention that the UUWF statute is unconstitutional as applied to him. See *Thompson*, 2015 IL 118151, ¶ 36. Although defendant, in applying *Bruen*, contends that the founders intended permanent disarmament only for *violent* felons, *Bruen* does not make any such distinction. As noted, this court has interpreted *Bruen* in the context of UUWF and has determined that *Bruen* only applies to laws that regulate the firearm possession of "law-abiding citizens." See *Baker*, 2023 IL App (1st) 220328, ¶ 37. This court has also found *Bruen* inapplicable to a constitutional challenge to the FOID Card Act, a violation of which was the basis for defendant's underlying AUUW conviction. See *People v. Gunn*, 2023 IL App (1st) 221032, ¶ 19 (noting that the *Bruen* court "explicitly acknowledged that background checks, which are the cornerstone of the FOID Card Act, are permissible").

¶ 53    In sum, we do not find that the UUWF statute is unconstitutional on its face or as applied to defendant.

¶ 54    For the reasons stated, we reduce defendant's sentence for misdemeanor domestic battery to 364 days' imprisonment and correct the mittimus to reflect the correct sentence. We otherwise affirm the judgment of the circuit court of Cook County.

¶ 55    Affirmed as modified; mittimus corrected.

---

[3] Under Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2021), unpublished orders entered on or after January 1, 2021, may be cited for persuasive purposes.